SHALER UMBRELLA COMPANY, Respondent, vs. BLOW, Appellant.

*September 10—October 8, 1929.*

For the appellant there was a brief by *Reilly & Cosgrove* of Fond du Lac, and oral argument by *M. K. Reilly.*

For the respondent there was a brief by *Hooker & Wagner* of Waupun, and oral argument by *C. E. Hooker.*

Owen, J. This action is brought by plaintiff to recover from the defendant moneys advanced to him in excess of commissions earned by the defendant at a time when he was in the employ of the plaintiff selling its products upon commission. It involves the question whether an agent working upon a commission is personally liable for advances made to him in excess of commissions earned, in the absence of an express agreement on his part to repay such excess. There is a division of authority upon the subject. In the following cases it is held that under such circumstances the obligation of the employer is limited by the commission agreed to be paid, and that when advances are made in excess of commissions earned, an agreement on the part of the agent to repay such excess will be implied: *Clarke v. Eastern Advertiser Co.* 106 Me. 59, 75 Atl. 303; *Strauss v. Cohen Bros. Co.* 169 Ill. App. 337; *Williams Mfg. Co. v. Michener,* 13 Ontario Weekly Rep. 46; *Martinez v. Cathey* (Tex. Civ. App.), 215 S. W. 370; *Snellenburg C. Co. v. Levitt,* 282 Pa. St. 65, 127 Atl. 309.

In 2 Corp. Jur. p. 787, it is said: "In the absence of a special agreement, an agent who receives advances on account of commissions cannot be held to a personal liability for such advances, although the commissions earned by him do not equal the advances, and although his employment has ceased." This rule finds support in the following well reasoned cases: *Roofing Sales Co. v. Rose,* 103 N. J. L. 553, 137 Atl. 211; *Luce v. Consolidated Ubero P. Co.* 195 Mass. 84, 80 N. E. 793; *Arbaugh v. Shockney,* 34 Ind. App. 268, 72 N. E. 668; *Northwestern Mut. L. Ins. Co. v. Mooney,* 108 N. Y. 118, 15 N. E. 303; *Schnabel v. American Educational Alliance,* 79 Misc. 624, 140 N. Y. Supp. 369; *Louis Auerbach, Inc. v. Ramer,* 80 Misc. 645, 141 N. Y. Supp. 848; *Lester C. Hebberd & Co. Inc. v. Blake,* 175 N. Y. Supp. 478; *Goldberg v. Kleinberg,* 179 N. Y. Supp. 364.

The reasoning supporting the conclusion that there is no personal liability on the part of the agent for excess advances may be epitomized as follows: An undertaking whereby an employer sends out an agent to work upon a commission is in the nature of a joint adventure from which both hope to profit. The employer profits by the development and enlargement of its business and the agent by remunerative employment. The undertaking may prove a success or a failure. If the agent be required to repay all the advances made in excess of his commissions earned, the entire risk of the adventure is his, and a construction leading to this result will not be indulged where there is no express agreement on the part of the agent to repay such excess. It is pointed out that such a liability on the part of the agent does not necessarily arise from the agreement on the part of the employer to make certain advancements. To advance does not necessarily mean to loan. In *Northwestern Mut. L. Ins. Co. v. Mooney*, 108 N. Y. 118, at p. 124, 15 N. E. 308, it is said:

"To advance is to bring forward. Standing by itself it means nothing more than that the company will 'forward' to Mooney this money; they will take it from their treasury and put it in his hands. For what purpose must be elsewhere ascertained. It may characterize a gift; it may be in anticipation of a debt to mature at a future time; it may characterize an act by which a consignee is put in funds for the management of the business of the consignor, or any transaction by which an agent, through the use of money, is desired to promote the business of the employer. In other words, the use to which it is to be put will determine the nature and qualify the character of the advance."

In *Arbaugh v. Shockney*, 34 Ind. App. 268, at p. 275, 72 N. E. 668, the court says:

"An advance is something which precedes. It might be, as between these parties, made in anticipation of expected commissions, and, in such event, would no more create a

debt than would an advancement made by a father to a son in anticipation of the expected inheritance by the latter."

In a consideration of this as well as all other contracts the purpose is to discover the intent of the parties. Where it is the intent of both parties that the agent shall repay the excess of advancements it is a simple matter to expressly so provide. Where there is no such express provision it is not necessarily to be implied from the term "advancement," and ought not to be implied in view of the general character of the undertaking. Where the liability of the agent must rest upon construction, neither reason nor justice would seem to support a rule which would place upon the agent the entire burden of a venture designed for the benefit of both parties. We hold that there is no personal liability upon the part of an agent employed upon a commission basis to repay advances made to promote the venture, or pursuant to the terms of the contract of employment, in excess of commissions earned, in the absence of an express agreement on his part to make such repayment, and in all such cases the employer is limited to the commissions actually earned for recoupment.

Having settled upon the law applicable to the case we must now ascertain the contract between these parties. The contract rests in parol, and, as usual, the parties do not agree as to what the contract was. We must determine this upon the conflicting evidence given upon the trial by David W. Jones, the president of the plaintiff company, Frederick Edward Rikkers, who was vice-president at the time the defendant was employed, and the testimony of the defendant himself. Mr. Jones is the only one who testified in behalf of the plaintiff with reference to the terms of the contract of employment. His testimony is brief and terse and consists altogether too much of his conclusions. He testified that Rikkers, although vice-president of the company, was also one of its traveling salesmen. He said that Blow had a talk with Rikkers and understood how he was working, "and

he came to us and wanted a position under the same arrangement, which was a straight commission; which means a man pays all his own expenses and gets a commission on the goods he sells. *Q.* Was there anything said about advancements of traveling expenses or money of that kind? *A.* No, at the time he got ready to start out he said that he had loaned his father all his ready cash and he didn't have the ready cash to start himself on the road and he wanted to know if he couldn't borrow it from us, and we loaned him $100 to start him out and took his note for it." He, Jones, explained to Blow how their traveling men traveled, and Blow said he had talked with Mr. Rikkers and understood it, and Jones told him it was on a straight commission, and he, Blow, was to pay all expenses, and the drawing account would be fifty per cent. of his commission, payable immediately upon the acceptance of the order in the future, and the other fifty per cent. when the goods were shipped, but that they often waived that rule with their traveling men and forwarded the greater portion of it before the goods were shipped. "I think he understood thoroughly the terms and conditions as I stated them after that, as he undoubtedly talked it over with Mr. Rikkers, because he said he had." Blow testified that "I asked Mr. Jones how about expense money, and he told me at that time to write ahead one Sunday where I would be the next Sunday; that they would send my expense money to me. Mr. Rikkers and Mr. Jones both told me at that time that it would be necessary to have $50 sent to me to carry me through the week. I told Mr. Jones and Mr. Rikkers that I had a family to support, and asked them, supposing I don't make enough in these commissions to support my family, and Mr. Jones told me, if you show us that you can sell our line we will advance you money to support your family." Rikkers testified: "He [Blow] was a little in doubt about his getting business enough and he made the specific question about that. He wanted to know what

would happen in case his commissions did not come up to what he drew and money for his wife and family, and Mr. Jones made the remark that he would see that the family was taken care of for as long as he sold umbrellas. There was nothing said at that time about a loan. *Q.* Was there anything said about the expense account that was to be advanced and how much? *A.* Not particularly, just he was to have the same as I did. The talk was that I had been using $50 a week for expenses and I took it all."

It further appears that Blow was being advanced not only his expenses but enough to support his family. However, whether this was in excess of his commissions does not appear, as the court prevented the witness from testifying upon that question. Upon rebuttal Jones did not deny this testimony. He simply testified that the advancements were to be repaid if the commissions did not "take care of them." This was simply his construction of the conversation and merely evidenced his conclusion with reference thereto.

The court found in effect that the plaintiff did not agree with the defendant that in the event the defendant's commissions did not amount to enough to pay his traveling expenses the plaintiff would pay to the defendant such sums as living expenses to the family, or any other sum, except the commissions so earned by said defendant, and that it was not agreed that the plaintiff should pay to defendant at least the sum or sums required to pay the traveling expenses and living expenses of himself and his family during the period of his employment, nor that said plaintiff was to pay the said defendant any other sums than what the defendant should earn as commissions.

Now the fact is undisputed that the defendant went out on the road; that $50 a week was sent to him with almost even regularity no matter what the state of his commission account. There are also upwards of a dozen letters in the

record written by the defendant to the plaintiff when he was out on the road asking him to give his wife some money, one asking him to pay a $200 coal bill, one asking him to send a check to a Milwaukee firm for $27.50 to pay for a suit of clothes, all of which was complied with by the plaintiff without question, comment, or protest. The account introduced in evidence shows that on one occasion $200 was advanced to Blow. Blow testified with reference to this item that Jones told him it was rather a large sum to be advanced and wanted him to sign a note for it. Blow told him No, that if his time "wasn't worth something to the company" then he was through. The amount was advanced as requested.

In view of the positive testimony of Blow, in view of the testimony of Rikkers, in view of the practice which prevailed between the company and Blow, in view of the failure of Jones to deny the testimony of Blow and Rikkers, in view of the fact that his own testimony is little more than his construction of the agreement with reference to advances, in view of the prompt and willing advances made upon Blow's request, and in view of the fact that $50 a week was forwarded to Blow with such regularity, we are forced to the conclusion that the finding of the court that the plaintiff did not agree to advance to Blow $50 a week for his traveling expenses, and enough to enable his family to live, is against the great weight and fair preponderance of the evidence. We conclude that the plaintiff agreed to make such advances.

It is argued that the agreement to make advances for the support of defendant's family was void because of its indefiniteness and uncertainty. Whatever the merit of this contention would be in an effort to enforce the contract while it remained executory, it is without avail here after the contract has been fully executed. It is true that the plaintiff did not commit itself to the advancement of any definite amount

for the support of defendant's family. But it had that matter entirely under its control at all times. It is apparent that the advancements for the support of the family were made by the plaintiff pursuant to its promise to see that the family was taken care of as long as the defendant sold its umbrellas. If that was an indefinite and uncertain contract, further advancements could have been refused at any time. However, in view of the fact that there is no agreement, express or implied, on the part of the defendant to return them, no part of the advancements constituted a personal liability against the defendant, and they cannot be recovered.

Judgment went against the defendant in the sum of $2,532.05. It appears that this includes the item of $100 for which defendant gave plaintiff his note before he commenced work. This item did not constitute an advancement. The transaction amounted to a loan. The defendant is evidently indebted to the plaintiff for the amount of this note unless he has some defenses thereto other than appear upon this record. This seems quite unlikely. As it is desirable to terminate the litigation, all rights of the parties will be preserved by the following mandate:

*By the Court.*—The judgment is reversed, and cause remanded with instructions to enter judgment in favor of the plaintiff and against the defendant for the amount due upon the note upon the surrender of the note into court, unless upon such surrender and within ten days from notice of such surrender served upon the defendant's attorneys he shall file an answer setting up a valid defense to said note. Upon the filing of such an answer the issues raised thereby shall be tried and judgment rendered as directed by the trial court.