Hoefer, Plaintiff and Respondent, vs. Last and others, Defendants and Appellants: Hoefer and another, Defendants and Respondents.

*March 3—March 31, 1936.*

For the appellants William Last and Lumbermen's Mutual
Casualty Company there was a brief by *Quarles, Spence &*

*Quarles,* and oral argument by *Arthur Wickham,* all of Milwaukee.

*Clarence F. Whiffen* of Sheboygan, attorney and guardian *ad litem* for the appellant Arnold Last.

For the respondent Jeznette Hoefer there was a brief by *Voigt & Voigt* of Sheboygan, and oral argument by *Charles Voigt.*

For the respondent Ernst Hoefer there was a brief by *Bassuener & Humke,* and oral argument by *John Poole,* all of Sheboygan.

*E. J. Herte* of Milwaukee, for the respondent Frank S. Tillman.

FRITZ, J.   On this appeal, it is conceded that the defendant, Penkwitz, was negligent in operating a motor truck which collided with an automobile driven by the defendant, Ernst Hoefer, in such manner as to injure him and the plaintiff, Jeznette Hoefer, who was in his car; and that Penkwitz' negligence caused the injuries then sustained by the plaintiff and Ernst Hoefer.   However, the appellants, William Last, Arnold Last, and the Lumbermen's Mutual Casualty Company, as the insurer under an automobile liability policy which it had issued to Arnold Last on that motor truck, contend that, (1) William Last and Arnold Last were not the employers of Penkwitz, as found by the jury, and that therefore they are not liable for Penkwitz' negligence; that (2) there was no proper proof that Ernst Hoefer was damaged to the extent of $5,000 or any amount because of loss of earnings; and that (3) if neither William Last nor Arnold Last is liable, there is no liability under its policy on the part of the defendant insurer.   In addition, Arnold Last contends that, (1) the jury's finding that the defendant, Penkwitz, was in his employment was against the great weight of the evidence and without any foundation in fact; that (2) even if a partnership existed between him and William Last whereby employment of Penkwitz by William Last, if estab-

lished, could be imputed to Arnold Last, it would be improper, because he was a minor, to impute that status to him from merely the actions of the parties or the surrounding circumstances; and that (3) as he was a minor, he could not make a valid contract creating the relation of master and servant between himself and Penkwitz, and therefore could not be held liable for the latter's negligence under the doctrine of *respondeat superior*. There is no contention that Penkwitz was an independent contractor at the time he was operating the truck, and the principal controversy is as to whether he was doing so as an employee of the defendant, Tillman, or of William and Arnold Last, or either of them.

As the appeal is from a judgment based upon jury findings which the court approved in ordering judgment thereon, the question on appeal is not, as contended by Arnold Last, whether the verdict is against the great weight of the evidence. On the contrary, the inquiry is limited to the narrow issue of whether there is any credible evidence that, under any reasonable view, will admit of inferences which may have been drawn by the jury in finding as it did. *Trautmann v. Charles Schefft & Sons Co.* 201 Wis. 113, 116, 228 N. W. 741. A review of the record with that rule in mind discloses that there was credible evidence which reasonably admitted of finding the following facts:

In 1934, William Last and his son, Arnold, were engaged in the business of hauling gravel and similar material on motor trucks. They used four trucks which were purchased by William Last; but, subsequently, he had licensed and registered two of them in his name and two in Arnold's name. Penkwitz was driving one of the latter when his negligent operation thereof caused the injuries to the Hoefers. William Last usually collected the earnings for hauling materials on the four trucks, and out of those earnings, he paid the operating expenses, and made payments to Arnold for his work, and then deposited part of the balance of the net earnings to the credit of Arnold and a younger son.

In the fall of 1934, the defendant, Tillman, entered into a contract with Ozaukee county for the construction of a concrete highway as a federal P. W. A. project. Under the federal N. I. R. A. code regulations, all workmen, including truck drivers, who were required in order to execute the project, had to be obtained on requisition made by Tillman, through Arthur N. Clapham, the national re-employment manager for the county of Ozaukee, under rules and regulations, and on forms prescribed by the federal and state government authorities. In accordance with those rules and regulations, Tillman, in order to obtain drivers to operate trucks required on the project, filed an application on the prescribed form, in which his name was inserted under the designation "employer or firm," for twenty-two drivers, who under the government regulations had to be paid fifty-five cents per hour. Tillman was permitted to contract with truck owners for the transportation of materials, and he made an offer to an assembled group of five or six truck owners, including William Last, who were known as the "Ozaukee Haulers," to pay sixty-four cents for each two and one-half ton batch of mixed gravel and cement hauled by them from certain places to the concrete mixing machine used on the project. The truck owners, including William Last, accepted that offer. The sixty-four cents per batch constituted the compensation to the truck owners for the transportation of those materials on their trucks, and out of that compensation, each owner had to pay all charges incurred for gasoline, oils, repairs, and labor in operating the trucks, including the drivers' wages at the prescribed rate of fifty-five cents per hour. To insure the receipt of those wages by the drivers, the government regulations required that their names had to carried on Tillman's pay roll, and that their wages had to be paid directly to each driver by Tillman upon the approval indorsed by the truck owner upon the driver's biweekly timecard, on which his time, rate of pay, and total amount to be paid to him were noted.

Penkwitz had been employed by William and Arnold Last to drive their trucks on other jobs, and upon Tillman's procuring the contract for the P. W. A. project, Penkwitz applied to William Last to employ him to drive one of the Last trucks. William Last directed Penkwitz to apply to Clapham, and he issued to Penkwitz, as an applicant for the position of truck driver, a government "Referral or Introduction" card, addressed to Tillman. Upon Penkwitz' presentation of that card to Tillman's foreman, he signed Tillman's name in a blank space on the card above the words "Employer's Signature." That card was then mailed to Clapham, and he prepared a list naming twenty truck drivers supplied pursuant to Tillman's requisition, six of whom, including Penkwitz and Arnold and William Last, were listed as drivers of the Last trucks. Thereupon Penkwitz, without being given any directions, then or at any time thereafter, by Tillman, or his foreman, as to what truck he should drive or in what mode or manner he should do so, went to the Ozaukee county's highway service garage, where trucks belonging to the "Ozaukee Haulers" were assembled, and took charge of Arnold Last's truck and commenced transporting batches of materials on that P. W. A. project. William and Arnold Last, as well as the other drivers listed by Clapham, likewise took charge of trucks and hauled materials. Tillman's foreman directed when and where the batches of material were to be hauled, but otherwise they gave no directions to the drivers, and exercised no control over their operation of the trucks. The truck owners were entitled, under the government regulations to "collaborate" with the contractor in choosing a qualified driver. For the three biweekly periods that Penkwitz was employed up to the time of the accident, three timecards, dated October 31, November 15, and November 30, 1934, were issued to him, on which Tillman had entered the amount of his time and wages for each period. On each card, as furnished by the government, there was printed, "Void when not signed by the foreman" and

also "O. K. by" with a blank line for a signature. Penkwitz presented those cards to the Lasts, and two of them were O. K.'d by William H. Last, and the other by Arnold Last. Thereupon, Tillman paid Penkwitz the amount of his wages as approved by the Lasts on those cards; and, after deducting those payments from the totals owing by Tillman to the Lasts for the batches hauled on their trucks by Penkwitz at the rate of sixty-four cents per batch, the remaining balances were paid by Tillman to William and Arnold Last. Thus, both of the Lasts knew that sixty-four cents was the entire cost to Tillman for the transportation of a batch of material, and that to entitle them to that compensation they had to provide not only the truck, but also everything, including the labor, necessary for the operation thereof. The mere furnishing of the truck, and the necessary gasoline and oil, without also the performance at their expense of the work of driving, did not entitle them to that compensation of sixty-four cents per batch for the transportation thereof. Consequently, Penkwitz, in driving the truck was performing work which was an essential part of their obligation, and therefore his performance thereof was clearly for their benefit. In accepting from Tillman payment of the balance of the compensation for the transportation of materials, at sixty-four cents per batch, on Arnold Last's truck driven by Penkwitz, which remained upon deducting therefrom, with their approval and consent, their expense for Penkwitz' wages at fifty-five cents per hour for driving their truck for their benefit with their knowledge, they accepted him, at least by implication, as their employee, and the doctrine of *respondeat superior* became applicable to render them liable for Penkwitz' negligence in operating that truck. That doctrine, as was stated in *Apfelbacher v. State,* 160 Wis. 565, 575, 152 N. W. 144, "rests upon the idea that where an enterprise is carried on for the financial benefit of a master it is con-

sidered just that he should answer for the tort of his servant in conducting it because he is deemed to profit financially by its being carried on." Accordingly, it has been held that, "When one knowingly and without objection receives the benefits of labor, or holds out to the public one as engaged in his service, he is liable, as a master, for the negligence of such servant, when the act or failure constituting the negligence comes within the apparent scope of the servant's employment, even though the person for whom the service is rendered has not employed or paid the servant." *Denver & Rio Grande R. Co. v. Gustafson,* 21 Colo. 393, 41 Pac. 505, 506; *Beal v. Chicago, Burlington & Quincy R. Co.* (Mo. Sup.) 285 S. W. 482; *Mangum v. North Carolina R. Co.* 145 N. C. 152, 58 S. E. 913, 13 L. R. A. (N. S.) 589. In Wood, Master and Servant (2d ed.), sec. 7, the rule in that regard is stated as follows: "It is not essential in order to constitute the relation of master and servant as to third persons, that there should be any contract between the parties, or any intention on the part of either to create such a relation, or that compensation should be expected by the servant for the services rendered. . . . The real test as to third persons is, whether the act is done by one for another, however trivial, with knowledge of the person sought to be charged as master, or with his assent, express or implied, even though there was no request on his part to the other to do the act in question. If so, he is liable to third persons for all injuries resulting to them from the negligent or improper execution of the act."

However, as is stated in Wood, Master and Servant (2d ed.), sec. 281: "In order to be held chargeable for the acts of another, the person sought to be charged must have at least the right to direct such person's conduct and to prescribe the mode and manner of doing the work; and the person for whose acts he is sought to be charged must at the

time when the act complained of was done not only have been acting for him, but also must have been authorized by him either expressly or impliedly to do the act."

In the case at bar, there was no evidence that Tillman did or had any right to direct Penkwitz' conduct or to prescribe his mode or manner of operating the Arnold Last truck. Neither he nor his foreman had ever assigned Penkwitz to that truck. The latter apparently undertook the operation thereof in furtherance of William Last's suggestion that he apply and qualify, under the government regulations for work as a truck driver on the P. W. A. project, and upon so qualifying he continued to operate that truck with William and Arnold Last's acquiescence, and for their joint benefit and profit. As far as there is any proof on the subject, the Lasts, as the proprietors of the hauling business in which they were putting that truck to use, certainly had the exclusive right to permit or to refuse to permit Penkwitz to drive it, and to prescribe his conduct and mode and manner in doing so. Although it was left to Tillman to designate where and when the materials were to be transported, the Lasts did not thereby surrender to him the right, which they, as owners or proprietors of the truck, are presumed to have, to the management and control thereof, in order to insure its safety and preservation. When a vehicle with a driver is furnished or lent to another, the circumstances are often such that, while the driver becomes in some respects the servant of the person to whom the vehicle is furnished, and who has the right to tell him what to do and where to go, he is nevertheless the servant of the owner thereof in those particulars which relate directly to the management thereof, because it is implied that in the interest of such owner, and as his representative, the driver will manage and direct, within reasonable limits, such matters as pertain to the safety and preservation of the vehicle. In those particulars, for the preservation of his property, it will be presumed that the

owner retains the right to control the driver. *Dutton v. Amesbury National Bank,* 181 Mass. 154, 63 N. E. 405, 408; *Reagan v. Casey,* 160 Mass. 374, 36 N. E. 58; *Huff v. Ford,* 126 Mass. 24. In applying that rule in *Wagner v. Larsen,* 174 Wis. 26, 30, 182 N. W. 336, the court said:

". . . Where an owner hires his team and driver, or his automobile and chauffeur, or his machine and operator to another to do work to be designated and as directed by the hirer, the hirer having no authority by the terms of the contract of hire to discharge the driver, chauffeur, or operator and substitute another, the driver, chauffeur, or operator remains the servant of the owner in matters relating to the safety and management of the team, automobile, or machine, and the owner is liable to third persons for damages resulting from the negligent management or operation of the team, automobile, or machine by such servant. [Cases.]

"The reason is that the hiring is not of the team distinct from the driver or of the driver distinct from the team, but is the hiring of the entity composed of the two. While the hirer acquires dominion or authority over the entity to designate the work that shall be done and direct the manner of doing it, he acquires no authority to direct how the team shall be driven, managed, or cared for, nor can he divide the entity by separating the driver from the team. . . .

"It is entirely possible and consistent, as pointed out in *Driscoll v. Towle,* 181 Mass. 416, 63 N. E. 922, for the driver to be the servant of the hirer in the general performance of the work and remain the servant of the owner in the details of driving, caring for, and managing of the team." (p. 31.)

It follows that, because William and Arnold Last had the right to prescribe Penkwitz' conduct and his mode and manner of operating Arnold Last's truck, and because Penkwitz was operating it for their benefit and profit at the time of the accident with, at least, their implied authority to do so, the doctrine of *respondeat superior* is applicable to both William and Arnold Last and renders both of them liable for Penkwitz' negligent operation thereof, unless, as Arnold Last

contends, the fact that he was a minor prevents the application of that doctrine to him, in view of the rule established in *Covault v. Nevitt,* 157 Wis. 113, 146 N. W. 1115, 51 L. R. A. (N. S.) 1092. That decision fully sustains his contention that he could not, as a minor, make a valid and nonvoidable contract creating the relation of master and servant; and that, in the absence of that relation, the doctrine of *respondeat superior* is not applicable in so far as personal liability on his part is concerned.

However, as the policy issued by the Lumbermen's Mutual Casualty Company to Arnold Last on his motor truck had a clause extending the coverage of the policy so as to be available in the same manner and under the same conditions as it is available to the named assured, to any person or persons while operating the truck, or to any person legally responsible for the operation thereof, "provided such use is with the permission of the named assured," and as at the time of the accident, Penkwitz was operating the truck with the permission of Arnold Last, the insurer is liable under its policy to the Hoefers for the damages which they sustained as the result of Penkwitz' negligent operation of that truck.

The defendants, William Last and the Lumbermen's Mutual Casualty Company, contend that the jury's assessment of $5,000 for Ernst Hoefer's loss of earnings is not supported by evidence because there was no evidence as to the payment of any salary to Ernst Hoefer. They claim that the sum of $50 per week, which he had received up to the time of the accident in November, 1934, from a corporation of which he was an officer, and in which he owned all of the stock excepting a few qualifying shares, was paid to him simply as a drawing account; and that he made no personal income tax return for 1934, which can only be explained because that weekly payment was a loan and not salary. On that subject, the record discloses that, although Hoefer testified on direct examination, that he had a weekly

drawing account of $50, his testimony on cross-examination negatived an inference suggested by defendants' counsel that the $50 weekly drawing was not intended as salary. Furthermore, it appears that in the corporation's 1934 income tax return, Hoefer had reported the payment of $2,200 in 1934 to himself as his compensation as secretary and treasurer for devoting his entire time to the corporation's business. He testified that meant the entire time that he put in up to the time that he went to the hospital in the early part of November, 1934, and that he did not work, or draw anything after he was hurt. The proof that the $2,200 paid to Hoefer to November, 1934, had been treated in the 1934 corporate income tax return as compensation paid to him, and his testimony declining to acquiesce in counsel's suggested inference that the $2,200 were not paid to him as salary, resulted in sufficient conflict on that subject to make it an issue of fact for the jury. On the other hand, the mere fact that money was advanced periodically to an employee does not necessarily mean that it was a loan. *Shaler Umbrella Co. v. Blow,* 199 Wis. 489, 491, 227 N. W. 1; *Larson v. Watzke,* 218 Wis. 59, 259 N. W. 712.

Furthermore, there was ample evidence to establish that Hoefer's ability and business activities up to the time of his injury were such that he was capable of realizing substantial earnings, and that, by reason of the serious injuries which he sustained as the result of Penkwitz' negligence, his physical and mental faculties have been so impaired that there has necessarily been such a decided impairment of his efficiency and capacity to earn that, regardless of what was paid theretofore, or lost in earnings up to the time of the trial, his probable future loss in earnings will be at least $5,000. When proof convincingly establishes a material impairment of future earning capacity, as the result of injury to a person whose earning capacity was theretofore not impaired, the mere fact that he was not actually earning during a

period immediately preceding his injury, does not defeat his right to recover for his probable future loss in earnings as the result of his impaired earning capacity. As the court said in *El Paso Electric R. Co. v. Murphy,* 49 Tex. Civ. App. 586, 109 S. W. 489, 490:

". . . It must be observed that the matter to be determined is not what he actually earned before his injury, but what his earning capacity actually was, and to what extent that *capacity* has been impaired."

See also *Storrs v. Los Angeles Traction Co.* 134 Cal. 91, 66 Pac. 72, 73; *Fedorawicz v. Citizens' E. I. Co.* 246 Pa. 141, 92 Atl. 124, 125; *Pawlicki v. Detroit United Ry.* 191 Mich. 536, 158 N. W. 162; *Fisher v. Jansen,* 128 Ill. 549, 21 N. E. 598; 17 C. J. p. 784, § 108.

*By the Court.*—Judgment affirmed excepting in respect to Arnold Last; and reversed as to him with directions to dismiss the complaint and cross complaint against him.