## No. 21310.

WALTER C. BADGER *v.* NU-TONE PRODUCTS CO., INC.
(425 P.2d 698)

Decided March 27, 1967.     Rehearing denied April 17, 1967.

DELANEY and COSTELLO, DAVID L. KOFOED, for plaintiff in error.

WILLIAM RANN NEWCOMB, for defendant in error.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

In a claim tried to the court without a jury the defendant in error, Nu-Tone Products Co., Inc. (Nu-Tone), obtained a judgment of $4,214.35 against Badger, the plaintiff in error, based upon the terms of a written instrument designated "Salesman's Agreement" (Agreement "A"). The amount of the judgment represented the

amount by which advances made by Nu-Tone to Badger exceeded commissions earned by Badger on his sales of Nu-Tone products. The trial court, in concluding the trial, stated:

". . . The Court did find specifically, and the Court finds now, that the original contract was in force and effect at all times and that the advances that were made were made under that contract [Agreement "A"]."

The court's decision turned entirely upon that court's interpretation of Agreement "A." Badger disagrees not only with the court's interpretation of the so-called Salesman's Agreement (Agreement "A"), but also complains of its failure to consider, in determining the intention of the parties thereto, a contemporaneously executed instrument which was designated "Nu-Tone Reserve Fund Agreement" (Agreement "B"), which had been received in evidence by the court.

It was agreed in the pre-trial order that both instruments were drafted by Nu-Tone, both related to the employment of Badger by Nu-Tone, and both were executed by each of the parties on June 2, 1961, as a preliminary to the employment of Badger by Nu-Tone.

The final paragraph of Agreement "A" recited that:

"It is expressly agreed and understood that this agreement constitutes the complete contract between the parties and no representations, promises or statements contrary hereto have been made by either party. . . ."

However, because that recital is contrary to the admitted facts, both instruments must be construed as one contract. 56 C. J. S., *Master and Servant*, § 7.

We are here mainly concerned with ascertaining the actual intent of both parties to this agreement. The ultimate question for our determination on this writ of error therefore is: Whether, under the terms of the agreement (Agreements "A" and "B"), there is any liability on the part of Badger to repay those advances

made by Nu-Tone which were in excess of the commissions earned? In *Moorman Mfg. Co. v. Rivera,* 155 Colo. 413, 395 P.2d 4, we find the following general rule pertaining to the construction of contracts:

". . . It is a general rule of construction that where a contract is ambiguous, it will be construed most strongly against the party preparing it or employing the words concerning which the doubt arises. . . ."

Another rule of construction pertinent to the contract between the parties here is found in 56 C. J. S. 73. It reads as follows:

"An employment contract includes not only what is expressly stated, but also what is necessarily implied from the nature of the relationship created, the language used, and the conduct of the parties. Also usages or customs prevailing in the particular employment and principles and rules of law applicable thereto become as much a part of the contract as though they were expressly incorporated or referred to therein. . . ."

█ In effect, the law is that where there is an ambiguity in an employment contract, in addition to the specific language used in the contract, the nature of the relationship, the conduct of the parties, the principles and rules of law applicable thereto are all impliedly a part of that contract and must be considered in arriving at the intention of the parties thereto.

█ Although this court has not decided a case in which the facts approximated those in issue here, it has had occasion to consider the law applicable to the employer-salesman relationship and has recognized the rule generally adhered to. In *Argonaut Builders v. Dare,* 145 Colo. 424, 359 P.2d 366, this court stated:

". . . where a contract of employment provides for advances to the employee to be charged to and deducted from the commission agreed upon as the same may accrue, *the employer cannot, in the absence of an express or implied agreement or a promise to repay any*

*excess of advances or* [sic] *commission earned, recover such excess advances from the employee.* Numerous cases supporting this doctrine are collected in 165 A. L. R. 1367. . . . and also in 57 A. L. R. 33. [Also, see *Shaler Umbrella Co. v. Blow*, 199 Wis. 489, 227 N.W. 1; *Selig v. Bergman*, 43 Wash. 2d 205, 260 P.2d 883; *Perma-Home Corp. v. Nigro*, 346 Mass. 349, 191 N.E.2d 745.] It would seem from the cases referred to and an analysis of the rule reported in 56 C. J. S. 561, *Master and Servant*, sec. 120c, that the basis for the doctrine is that *the payments are made in regular amounts in consideration of continued activity by the employee and are thus in the nature of salary or wages.* Because of this regularity of payment and the requirement that the employee give his full time to the employment, the presumption arises that the advances are recoverable only from commissions and thus the excess cannot be collected by the employer." (Emphasis added.)

The bellwether case on the subject, and the one inferentially alluded to in *Argonaut Builders v. Dare, supra,* is *Richmond Dry Goods Co. v. Wilson,* 141 S.E. 876 (W.Va.), 57 A. L. R. 31. The basic rule, as set forth there, and followed by the great majority of courts, is stated as follows:

"The law, supported by the weight of authority in respect to such contracts, is stated in Labatt's Master & Servant, 2d ed. vol. 2, § 461, pp. 1358, 1359: 'Such contracts do not, *in the absence of an express stipulation to that effect,* impose upon the employee a personal obligation to return the sums advanced to or withdrawn by him, in the event of his not earning enough in commissions to offset them. Accordingly if the amount of the advances or withdrawals exceeds the amount of the commissions earned by him, an action will not lie against him to recover the excess.' " (Emphasis added.)

Although both Agreements "A" and "B" in their entireties are significant because of their over-all impact,

we limit our discussion in this opinion to those provisions which are directly involved in arriving at our decision. From Agreement "A" we quote the following (Nu-Tone is first party; Badger is second party):

"2. The first party agrees to pay to the second party the following commissions on receipts for the sale of products, for which the second party has received orders, when the products have been delivered to, accepted and paid for by the purchaser, excluding receipts on orders shipped after the term of this agreement. These commissions are understood to embrace the expenses and compensation of the second party. . . .

"3. The first party may, *in its sole discretion*, advance monies to the second party, including a part or all of the commissions provided for above, upon the shipment of the order. *Any sum so advanced shall be a charge or set-off against any commissions due, or thereafter to become due. Any sum so advanced against anticipated commissions, which proves to be in excess of the commissions actually earned shall be an obligation of the second party to the first party* and shall in any event become due and payable within ninety (90) days from the date of the advancement. . . ." (Emphasis added.)

The following portions of Agreement "B" have a very direct bearing on our determination as to what the intention of the parties was in reference to the repayment of advances to Badger which exceeded his commissions:

"1. I understand that it is company policy to maintain a reserve account for salesmen against which certain charges may be made at time of termination.

"2. I hereby authorize the company to deduct each week from my drawing account, beginning with the first week in which I am placed on a drawing account, the sum of $10.00 and credit this amount to my reserve account until a total of $300.00 is accumulated. When my reserve account reaches the sum of $300.00 the company will cease deducting the $10.00 from my drawing

account. Whenever the $300.00 is reduced for any reason, the company will resume the deductions.

. . . . . . .

"4. In the event my employment by the company is terminated at any time for any reason, I agree *that the company may apply the balance in my reserve account against any money that I may owe the company on account of overdrafts, charge back of commissions, failure to return samples and sample case, cancelled sales or on account of any other valid reason.* I authorize the company to retain my reserve account for a period of two months from the date of termination of my employment in order to determine what charges may be made against it. At the end of such two months, I shall be entitled to the balance remaining. . . ." Emphasis added.)

With the foregoing general rules and the agreement in mind we turn now to the factual background in which the contracts were executed, the terms of the contract specifically involved in the solution of this litigation and the manner in which the parties to the contract did or did not adhere to it, in order to arrive at our decision.

Nu-Tone was a Colorado corporation, headquartered in Denver. Mr. Hayes was the president and managing officer of the company. Badger, at all pertinent times, maintained a home in Denver for his wife and five children. He had never worked as a traveling salesman prior to his employment by Nu-Tone. He was not employed on June 2, 1961, when he entered into the agreement to work for Nu-Tone. He was employed to sell the products of Nu-Tone throughout the western half of the state of Kansas. It was contemplated by the parties that Badger would furnish his own automobile to reach and cover his assigned territory, and pay his own away-from-home and family living expenses, including those of his automobile incurred in covering his territory.

Badger was paid $100 per week from the beginning.

Mr. Hayes testified that the $100 was arrived at by "advancing" Badger $16.50 per daily report from Monday through Friday, and $17.50 for Saturday's. In his testimony, initially, Hayes said that the $100 was "advanced" pursuant to the "discretion" reposing in Nu-Tone by virtue of paragraph 3 of Agreement "A." Subsequently, Hayes stated that he and Badger agreed to the arrangement in reference to the daily reports and that the payments "had nothing to do with the number of shipments made." However, he persisted that they were *advances on a regular basis* "against his anticipated commissions, just as stated in the contract."

The foregoing financial arrangement prevailed from June 2, 1961, until October 1, 1961. During this period, the testimony disclosed that the advances which Badger was receiving were not sufficient for him to maintain himself away from home and provide for his family. On October 1, 1961, by prearrangement, Badger, with his wife, met Hayes at the company offices to advise him of their financial plight and of the necessity to terminate the relationship. Hayes, in order to retain the services of Badger, agreed to advance an additional $500 per month, payable *regularly* in two equal semimonthly payments, although at this time Badger had drawn $579.85 more than his earned commissions. Nothing was said at this meeting about repayments. In his testimony Hayes stated that the $500 monthly payments had no relation to either the number of reports made by Badger or to the number of orders shipped to his customers. The amounts advanced continued to exceed Badger's commissions and the overdraft as carried on Nu-Tone's books gradually mounted until it reached $4,214.35 at the time he quit, on or about May 25, 1962.

Immediately following the October 1, 1961, meeting, Hayes wrote to Badger, saying:

". . . I am happy that we were able to conclude arrangements that will help take some of the immediate

pressure off your family. I have every confidence that you will make it okay in good shape."

We note that there is nothing in the letter to indicate that Nu-Tone expected repayment from any source other than future commissions.

Based on a letter written more than five months following the October 1, 1961, meeting, it 'seems perfectly clear that Nu-Tone had been and still was relying upon Badger's sales commissions to produce the fund to repay Nu-Tone for its advances to Badger. Hayes wrote Badger on March 1, 1962, as follows:

"The time has come for us to take a serious look at your overdraft.

"I am well aware of the bad conditions that have existed for the last three months, which have certainly contributed to the continual rise in your overdraft figure. Now, however, with the opening up of our heaviest buying season and the fact that you are now on the right path, it is of the utmost importance that this overdraft start downward.

"*You know the amount of sales necessary to cover your regular drawings. I would like you to start striving to get this amount covered the first four days of each week. Then use Friday and Saturday as overdraft days. In other words, put in all the extra effort possible to start a regular decline.* This is most important, both for your own well being and that of your company." (Emphasis added.)

The agreement provided that Badger would receive his commissions only when he had obtained an order, the goods had been shipped to, accepted and paid for by the purchaser (see paragraph 2 of Agreement "A"). However, the next paragraph provided that, "a part or all" of the foregoing commissions *may be advanced* in the *"sole discretion"* of Nu-Tone, *"upon the shipment of the order."* It was contemplated that Nu-Tone's discretion under the terms of the contract would be exer-

cised *only* "upon the shipment of the order." The record affirmatively shows that there was no relationship between the advances actually made and shipments to Badger's customers.

■ But, even if these advances were made under the terms of the contract, that is, "upon the shipment of the order," the next provision would negate any liability, for it provides that "Any sum *so advanced* shall be a charge or set-off against any commissions due, or thereafter to become due." "Charge or set-off against" negates a personal promise to repay from funds other than future commissions or the reserve fund.

■ Nu-Tone attempts to sustain its position on the basis of the next sentence, which reads:

". . . Any sum *so advanced* [they are still talking about the same advances which may be discretionally made "upon shipment of the order"] against anticipated commissions, which proves [at a later accounting] to be in excess of the commissions *actually earned* shall be an obligation of the second party to the first party . . . due and payable in ninety (90) days. . . ." (Emphasis added.)

This provision is still referring to advances "upon the shipment of the order," and to "commissions actually earned." The "obligation," as we see it, does not create a personal obligation to repay, as contended for by Nu-Tone, but, at most, creates an obligation against future commissions and the reserve fund. This provision apparently was designed to overcome the general rule that *regular advances* are treated as *salaries* and, in the absence of a specific provision, they are not recoverable at all. Here, after ninety days, they become a charge against future commissions.

All of the foregoing conclusions on the intent of the agreement become more apparent upon further examination of Agreement "B." It provides that the maximum amount of the reserve fund shall be $300, which indi-

cates to us that, in the exercise of Nu-Tone's discretion, the amount of *advances* over *commissions actually earned* would not prove to be excessive by more than that sum, and hence, Nu-Tone has fully protected itself.

It is obvious that Nu-Tone contemplated that Badger would owe the company some money when his employment terminated. The manner in which this indebtedness was expected to arise also appears in the agreement. Not set out above is paragraph 4 of Agreement "A," which requires Badger "to refund at once" to Nu-Tone, "any and all commissions paid to him on orders the purchase prices of which are uncollectible, in the sole judgment of" Nu-Tone. It was anticipated that the rest of the deficiency would be created by the items set forth in paragraph 4 of Agreement "B," *supra.* It is quite apparent that the $300 fund would have been adequate to meet the contingencies against which the company, in its experience, felt a need to provide, had Nu-Tone held the expenditures or "advances" under tighter control at all times. It permitted the advances to exceed the reserve account at its own risk.

▮ Considering the whole agreement ("A" and "B"), construing its terms, looking at the factual background, the interpretation put upon the agreement by the parties, and applying the law governing the relationship of the parties, we agree with the court, in *Shaler Umbrella Co. v. Blow, supra,* wherein it said:

". . . Where the liability of the agent must rest upon construction, neither reason nor justice would seem to support a rule which would place upon the agent the entire burden of a venture designed for the benefit of both parties. . . ."

Accordingly, we hold that there is no personal liability on the part of Badger, since there was no express agreement on his part to repay those amounts advanced to him which exceeded the earned commissions.

The judgment is reversed and the cause remanded

to the trial court with directions to enter judgment not inconsistent with the views expressed herein.

MR. JUSTICE HODGES dissenting.

MR. JUSTICE PRINGLE not participating.