A AND M TOWING AND RECOVERY, INC.
*v.* BERNARD GUAY ET AL.
(SC 17717)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued March 14—officially released May 15, 2007

*Judith E. Paquin,* for the appellants (defendants).

*David E. Kamins,* for the appellee (plaintiff).

*Opinion*

KATZ, J. In this action for unpaid rent under a lease of commercial premises and other relief, the defendants, Bernard Guay and Bernie's Repair Service, LLC (Bernie's), appeal from the judgment of the trial court rendered in favor of the plaintiff, A and M Towing and Recovery, Inc. The defendants' principal claim on appeal is that the trial court improperly awarded damages to the plaintiff for unpaid rent despite the plaintiff's failure to have a certificate of occupancy for the property, as required under General Statutes § 29-265 (a),[1] during the defendants' occupancy. The defendants essentially contend that the plaintiff's failure to obtain the certificate of occupancy was unlawful and in contravention to the public policy of protecting public safety underlying the requirement for obtaining such certification and, therefore, should preclude it from recovering under the lease. We affirm the trial court's judgment.

The trial court found the following facts that are uncontested on appeal to this court. The plaintiff has owned the subject property, located at 422 Tolland Street in the town of East Hartford (town), since at least 1983. The plaintiff applied for a certificate of occupancy for the premises, but did not receive one, despite

---

[1] General Statutes § 29-265 (a) provides in relevant part: "Except as provided in subsection (h) of section 29-252a, no building or structure erected or altered in any municipality after October 1, 1970, shall be occupied or used, in whole or in part, until a certificate of occupancy, as defined in the regulations adopted under section 29-252, has been issued by the building official, certifying that such building, structure or work performed pursuant to the building permit substantially conforms to the provisions of the State Building Code and the regulations lawfully adopted under said code. . . ."

efforts that continued after the defendants' occupancy of the premises began. In early 2003, the parties entered into an oral agreement for a month-to-month lease of the premises for $800 per month. The defendants planned to operate a towing and motor vehicle repair business on the premises. The plaintiff did not inform the defendants that there was no certificate of occupancy for the premises. The defendants took possession in March, 2003, and, a few days later, discovered that there was no certificate of occupancy when Guay went to the town hall to apply for a business license. The defendants thereafter informed the plaintiff that they intended to vacate the premises. In response, the plaintiff offered to provide the defendants with repair work if the defendants continued to stay on the premises. From March, 2003, through March, 2004, the defendants performed repair work on the plaintiff's vehicles, and the defendants billed and were paid thousands of dollars for that work. Shortly after March, 2004, the volume of business from the plaintiff tapered off noticeably, and the defendants subsequently refused to accept further work from the plaintiff.

The defendants stopped paying rent after November, 2003. Sometime in 2004, the plaintiff initiated a summary process action to evict the defendants, who thereafter vacated the premises in mid-December in accordance with the judgment in that action. Thereafter, the plaintiff initiated the present action in the Housing Session of the Superior Court in the judicial district of Hartford to recover from Guay unpaid rent for the period from December, 2003, through December, 2004, and to recover from Bernie's payment for towing services that the plaintiff had performed. The plaintiff also sought prejudgment interest and costs. The defendants admitted in their answer to the complaint that there was an oral lease for the terms alleged, but denied that Guay was liable for the unpaid rent, asserting as

a special defense that the plaintiff's failure to obtain a certificate of occupancy had "precluded [him] from using the rental premises for the intended purpose." After a trial to the court, Guay claimed in his posttrial brief that the evidence had established that, after he was unable to get his repairer's license from the town due to the absence of a certificate of occupancy, the parties had agreed to change the lease agreement to a barter arrangement whereby the plaintiff would refer business to the defendants and would take rent out of the profits.

Thereafter, the court rendered judgment in favor of the plaintiff, awarding $10,400 in damages for the unpaid rent, $2551.43 in interest on the rent, $1476.30 in damages for unpaid towing services and $295.26 in interest on the services. The court rejected Guay's claim that the parties had changed the lease agreement to a barter arrangement, concluding that the parties never had a meeting of the minds as to such an arrangement and that the evidence did not support the conclusion that such an arrangement had existed. The court also rejected Guay's special defense, concluding that the defense failed as a matter of fact and law, in that: he had offered no statutory or common-law authority to support his position; the evidence established that, for almost two years, from March, 2003, to December, 2004, the defendants had operated a towing and repair business from the premises servicing the vehicles of the plaintiff and others; and Guay had continued to pay rent for some time after learning that there was no certificate of occupancy. This appeal followed.[2]

The defendants raise two claims on appeal. First, Guay claims that the trial court improperly rendered

[2] The defendants appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

judgment in favor of the plaintiff as to the unpaid rent in light of the plaintiff's failure to obtain a certificate of occupancy. He contends that allowing recovery of rent under such circumstances violates the public policy of ensuring public safety that underlies the certificate requirement and that the plaintiff should not benefit from its unlawful conduct.[3] Second, both defendants claim that the trial court improperly awarded interest on the damages in excess of the statutorily mandated percentage. We reject both claims.

I

We first turn to the principal issue in this appeal, namely, whether a lessor of commercial property is

[3] *Guay also appears to claim that the lease is illegal and therefore unenforceable because the plaintiff lawfully could not contract to allow the* defendants to occupy the premises without a certificate of occupancy. Guay never raised this claim before the trial court, and the trial court did not address it in its memorandum of decision. Accordingly, we decline to address this claim to the extent that it is raised. We also note in this regard our concern as to the defendants' shifting legal theories as the case has proceeded from trial to appeal. The defendants initially asserted, as a special defense, that the plaintiff could not recover rent because the lack of a certificate of occupancy had prevented them from operating their business. After trial, the defendants added the claim in their posttrial brief that the lease agreement had changed to a barter arrangement. The trial court considered and then rejected that claim over the plaintiff's objection that the defendants had failed to raise this issue as a special defense. Thereafter, despite the defendants' failure to cite any statutes or case law to support their special defense as to the effect of the lack of the certificate on their ability to run their business, the trial court nonetheless considered whether there was any legal authority to support a special defense to an action to recover rent based on the absence of a certificate of occupancy. The defendants now claim on appeal that public policy precludes the plaintiff's recovery of rent, citing § 29-265 for the first time. Reading the trial court's memorandum of decision generously, we have determined that we will reach this claim because the trial court addressed this issue. See *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 216 n.18, 905 A.2d 1135 (2006) (raising similar concern). We reiterate, however, our well settled rules of practice requiring that a claim be raised distinctly in the trial court in order to preserve it for appeal. See Practice Book § 60-5; see also *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 164–65, 905 A.2d 1156 (2006) ("as a general rule, a party cannot present a case to the trial court on one theory and then

barred, as a matter of public policy, from recovering rent if the lessor has failed to obtain a certificate of occupancy for the property. As this issue is a question of law, our review is plenary. *Brown* v. *Soh*, 280 Conn. 494, 501, 909 A.2d 43 (2006); *Gurski* v. *Rosenblum & Filan, LLC*, 276 Conn. 257, 266, 885 A.2d 163 (2005). Moreover, to the extent that this question implicates the construction of statutes relating to certificate of occupancy requirements and the right of a commercial tenant to withhold rent, we are guided by well settled principles of statutory construction. See General Statutes § 1-2z (precluding resort to extratextual sources if text of statute and relationship to other statutes yields plain and unambiguous meaning); *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 405, 891 A.2d 959 (2006) ("[w]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter" [internal quotation marks omitted]).

We begin with § 29-265 (a), which precludes the use or occupancy of a building unless a certificate of occupancy has been issued. That section provides in relevant part: "[N]o building or structure erected or altered in any municipality after October 1, 1970, shall be occupied or used, in whole or in part, until a certificate of occupancy, as defined in the regulations adopted under section 29-252, has been issued by the building official, certifying that such building, structure or work performed pursuant to the building permit substantially conforms to the provisions of the State Building Code and the regulations lawfully adopted under said code. . . ." General Statutes § 29-265 (a). Pursuant to the regulations promulgated thereunder, a certificate of occu-

ask a reversal in the [S]upreme [C]ourt on another" [internal quotation marks omitted]).

pancy also certifies, inter alia, that the subject premises conform with local zoning regulations and the State Fire Safety Code and, for certain proposed structures or additions to structures, that the premises conform to building plans on file. See Regs., Conn. State Agencies § 29-252-1d, as amended by §§ 110.1.2 through 110.1.4 of the State Building Code (2005 Sup.).[4]

Section 29-265 does not prescribe a penalty for non-compliance, and the defendants have failed to identify

[4] Section 29-252-1d of the Regulations of Connecticut State Agencies, as amended by § 110.1.2 of the State Building Code (2005 Sup.), provides: "Zoning approval. Pursuant to subsection (f) of section 8-3 of the Connecticut General Statutes, no certificate of occupancy shall be issued for a building, use or structure subject to the zoning regulations of a municipality without certification in writing by the official charged with the enforcement of such regulations that such building, use or structure is in conformity with such regulations or is a valid nonconforming use under such regulations." This regulation essentially mirrors a requirement under General Statutes § 8-3 (f).

Section 29-252-1d of the Regulations of Connecticut State Agencies, as amended by § 110.1.3 of the State Building Code (2005 Sup.), provides: "Fire marshal approval. No certificate of occupancy for a building, structure or use subject to the requirements of the 2005 Connecticut State Fire Safety Code shall be issued without certification in writing from the local fire marshal that the building, structure or use is in substantial compliance with the requirements of the 2005 Connecticut State Fire Safety Code." General Statutes § 29-292 (b) (1) and (2) imposes more specific prohibitions on the issuance of a certificate of occupancy for residential premises relating to smoke detection, carbon monoxide detection and other warning equipment complying with the State Fire Safety Code.

Section § 29-252-1d of the Regulations of Connecticut State Agencies, as amended by § 110.1.4 of the State Building Code (2005 Sup.), provides: "Statement of professional opinion. Pursuant to section 29-276c of the Connecticut General Statutes, no certificate of occupancy shall be issued for a proposed structure or addition to buildings classified as (1) assembly, educational, institutional, high hazard, transient residential, which includes hotels, motels, rooming or boarding houses, dormitories or similar buildings, other than residential buildings designed to be occupied by one or more families, without limitation as to size or number of stories; (2) business, factory and industrial, mercantile, moderate and low hazard storage, having three stories or more or exceeding 30,000 square feet total gross area; and (3) nontransient residential dwellings having more than 16 units or 24,000 square feet total gross area per building, until the building official has been provided with a statement signed by the architect or professional engineer and the general contractor stating that the completed structure or addition

any other statute in their special defense, as required under the rules of practice, if they had intended to claim that the plaintiff statutorily is barred from recovering rent due to its noncompliance. See Practice Book § 10-3 (a) ("[w]hen any claim made in a complaint, cross complaint, special defense, or other pleading is grounded on a statute, the statute shall be specifically identified by its number"). Indeed, throughout these proceedings, the defendants have relied solely on common-law based theories, principally those based on contract law. Accordingly, although it is clear that the plaintiff acted in violation of § 29-265 by permitting the defendants to occupy the premises in the absence of a certificate of occupancy, we specifically must determine whether public policy precludes the plaintiff from recovering rent because of this violation.

In considering this question, it is significant that, under chapter 830 of the General Statutes, entitled "Rights and Responsibilities of Landlord and Tenant"; General Statutes §§ 47a-1 through 47a-20a; the legislature has prescribed various penalties for a landlord's failure to comply with applicable building and housing codes. " 'Building and housing codes' [are defined to] include any law, ordinance or governmental regulation concerning fitness for habitation or the construction, maintenance, operation, occupancy, use or appearance of any premises or dwelling unit"; General Statutes § 47a-1 (b); and those codes have been construed to include the obligation to obtain a certificate of occupancy under the State Building Code. See *Crabtree* v. *Van Hise*, 39 Conn. Sup. 334, 336 n.2, 464 A.2d 865 (App. Sess. 1983). This court previously has recognized, however, that, in accordance with the definitions set forth in chapter 830 that relate solely to dwellings; see

is in substantial compliance with the approved plans on file." This regulation essentially mirrors a requirement under General Statutes § 29-276c (b).

General Statutes § 47a-1;[5] this chapter generally applies only to residential tenancies.[6] See *Johnson* v. *Fuller*,

---

[5] General Statutes § 47a-1 provides in relevant part: "As used in this chapter and sections 47a-21, 47a-23 to 47a-23c, inclusive, 47a-26a to 47a-26g, inclusive, 47a-35 to 47a-35b, inclusive, 47a-41a, 47a-43 and 47a-46 . . .

"(c) 'Dwelling unit' means any house or building, or portion thereof, which is occupied, is designed to be occupied, or is rented, leased or hired out to be occupied, as a home or residence of one or more persons.

"(d) 'Landlord' means the owner, lessor or sublessor of the dwelling unit, the building of which it is a part or the premises. . . .

"(g) 'Premises' means a dwelling unit and the structure of which it is a part and facilities and appurtenances therein and grounds, areas and facilities held out for the use of tenants generally or whose use is promised to the tenant.

"(h) 'Rent' means all periodic payments to be made to the landlord under the rental agreement.

"(i) 'Rental agreement' means all agreements, written or oral, and valid rules and regulations adopted under section 47a-9 or subsection (d) of section 21-70 embodying the terms and conditions concerning the use and occupancy of a dwelling unit or premises. . . .

"(*l*) 'Tenant' means the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others or as is otherwise defined by law. . . ."

Although the term "landlord" clearly is defined in terms of residential dwellings only, we use the term "residential landlord" in this opinion for purposes of clarity.

[6] In 1997, the legislature added two provisions to chapter 830 that expressly refer to commercial tenancies. See General Statutes § 47a-4b, formerly § 53-303g ("No lease of commercial space in a shopping center or in a building occupied by two or more businesses entered into on or after October 1, 1979, shall require a lessee to be open for business seven days a week or on any specified day of the week. Any provision in a lease which violates this section shall be void."); General Statutes § 47a-11c ("If a landlord terminates a residential or commercial tenancy on the grounds that the tenant committed a breach of the rental agreement and the landlord brings an action for damages for the breach, such damages shall include the amount of rent agreed to by the parties but unpaid by the tenant. The landlord shall be obligated to mitigate damages. This section shall not limit either party's rights to assert other legal or equitable claims, counterclaims, defenses or set-offs.") In 1979, the legislature had transferred to chapter 830 another provision that refers to leases of land; see General Statutes § 47a-3d, formerly § 47-22; which has been construed to apply to commercial premises. See *669 Atlantic Street Associates* v. *Atlantic-Rockland Stamford Associates*, 43 Conn. App. 113, 121, 682 A.2d 572, certs. denied, 239 Conn. 949, 950, 686 A.2d 126 (1996); *David A. Altschuler Trust* v. *Blanchette*, 33 Conn. App. 570, 573, 636 A.2d 1381, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994). The legislature never has changed, however, the definitional section of chapter 830, which clearly defines the terms used throughout the chapter,

190 Conn. 552, 558, 461 A.2d 988 (1983); *S.H.V.C., Inc.* v. *Roy,* 37 Conn. Sup. 579, 585, 428 A.2d 806 (App. Sess. 1981), aff'd, 188 Conn. 503, 450 A.2d 351 (1982); *Hoban* v. *Masters,* 36 Conn. Sup. 611, 613, 421 A.2d 1318 (1980). Accordingly, because the subject property in the present case involves a commercial lease, not a residential tenancy, these provisions do not apply in the present case. Nonetheless, in determining whether there is a public policy in this state that would preclude a commercial lessor from recovering rent in the absence of a certificate of occupancy for the premises, it is useful to examine the nature and extent of remedies afforded to residential tenants as well as any afforded to commercial tenants for violations of applicable codes. See *Dow & Condon, Inc.* v. *Brookfield Development Corp.,* 266 Conn. 572, 592, 833 A.2d 908 (2003) (considering entire statutory scheme to determine whether illegal agreement to share real estate commission with unlicensed person violates public policy and whether that policy would bar enforcement of contract only as to private residential transactions or also as to commercial transactions); see also *Dowling* v. *Slotnik,* 244 Conn. 781, 812, 712 A.2d 396 (considering related unemployment compensation and general assistance schemes to determine whether, as matter of public policy, illegal immigrant status precludes claimant from remedies available under Workers' Compensation Act), cert denied sub nom. *Slotnik* v. *Considine,* 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998).

General Statutes § 47a-7 prescribes residential landlords' obligations to tenants. Section 47a-7 (a) (1) specif-

such as "landlord," "tenant," "rental agreement," "dwelling unit" and "premises," in relation to residential premises. See footnote 5 of this opinion. Accordingly, we do not infer from the aforementioned limited actions that the legislature intended to alter the existing scheme to extend to commercial premises all of the rights and obligations imposed in chapter 830 of the General Statutes. Moreover, as we previously noted, the defendants have not claimed that the plaintiff is barred by statute from recovering rent.

ically obligates the landlord to "[c]omply with the requirements of chapter 368o [relating to tenement and lodging houses] and all applicable building and housing codes materially affecting health and safety of both the state or any political subdivision thereof . . . ." Should the landlord fail to comply with this obligation, it is barred from recovering rent. See General Statutes § 47a-4a ("[a] rental agreement shall not permit the receipt of rent for any period during which the landlord has failed to comply with subsection [a] of section 47a-7"); see also General Statutes § 19a-362 (a) (barring under chapter 368o recovery of rent from tenant in tenement houses[7] if house is occupied in violation of State Building Code); General Statutes § 21-83c (barring recovery of rent from tenant in mobile manufactured home if landlord has failed to comply with, inter alia, General Statutes § 21-82 [a] [1], which requires compliance with "the State Building Code, the Fire Safety Code, and all applicable state laws and regulations, local ordinances and planning and zoning regulations materially affecting health and safety"). In addition, under General Statutes § 47a-14h, a tenant is authorized to institute a cause of action against a landlord who fails to adhere to its obligations under § 47a-7. For leases in which the term of the tenancy exceeds one month, the tenant also is authorized to terminate the rental agreement, upon sufficient notice and opportunity to cure, for a landlord's "noncompliance with section 47a-7 which materially affects health and safety . . . ." General Statutes § 47a-12 (a).

In addition to the aforementioned penalties that encompass a residential landlord's violation of the State

---

[7] A " '[t]enement house' " is defined to mean "any house or building, or portion thereof, which is rented, leased, let or hired out to be occupied, or is arranged or designed to be occupied, or is occupied, as the home or residence of three or more families, living independently of each other, and doing their cooking upon the premises, and having a common right in the halls, stairways or yards . . . . " General Statutes § 19a-355 (a) (1).

Building Code, including certificates of occupancy issued pursuant to that code, the legislature has prescribed numerous other penalties against a landlord for permitting conditions to exist on the premises that materially impair health and safety. These provisions may be enforced by the tenant in some cases, or by the municipality's enforcement agency in other cases. See General Statutes § 47a-5 (providing civil penalty against owner or lessor of premises for failure to obtain certificate of occupancy[8] prior to human habitation of building in towns that require such certificates); General Statutes § 47a-13 (providing remedies to tenant if landlord fails to provide essential services that it is required to provide); General Statutes § 47a-52 (c) (authorizing department of health to bring civil action to abate "danger to life or health" from defect in plumbing, sewerage, water supply, drainage, lighting, ventilation, or sanitary condition of rented dwelling and to issue order requiring premises to be vacated); General Statutes § 47a-57 (providing civil penalty against owner or lessor of multifamily premises who recovers rent for occupation of apartment or dwelling unit for which certificate of occupancy has not been obtained prior to rental); General Statutes § 47a-58 (providing for civil penalties and injunctive relief if, after notice from enforcing agency, owner of rental unit fails to correct violation of local housing code or chapter 833a of General Statutes).

By contrast, it appears that there are only a few penalties that apply to both residential and commercial leases, and those are enforced by the applicable municipal authority, not the tenant. See General Statutes §§ 8-3 and 8-12 (respectively, barring issuance of certificate of occupancy unless official certifies that building conforms with zoning regulations, and authorizing town's

[8] As explained later in this opinion, the certificates of occupancy at issue in General Statutes §§ 47a-5 and 47a-57 are different than the certificate of occupancy at issue in § 29-265.

zoning agency to take action to enforce adherence to regulations); General Statutes § 47a-53 (permitting town's board of health to declare any building as public nuisance and order its removal when conditions dangerous or detrimental to life or health are present). Indeed, enforcement actions have been taken under § 8-12 against landlords that have failed to obtain certificates of occupancy because the property does not conform to zoning regulations. See, e.g., *Gelinas* v. *West Hartford*, 65 Conn. App. 265, 284–85, 782 A.2d 679 (affirming imposition of fines in favor of municipal zoning agency for, inter alia, use of property without certificate of occupancy), cert. denied, 258 Conn. 926, 783 A.2d 1028 (2001).

Two conclusions may be drawn from this scheme, both of which weigh against the defendants' public policy argument. The first is that the legislature's provision of such a comprehensive scheme to protect residential tenants juxtaposed against the near absence of protections for commercial lessors strongly suggests that the legislature did not consider the public policy concerns of health and safety in the residential and commercial settings to be equivalent. See *D'Angelo Development & Construction Co.* v. *Cordovano*, 278 Conn. 237, 245, 897 A.2d 81 (2006) (concluding that contrast between absence of provision addressing enforceability of contracts that fail to comply with statutory requirements of New Home Construction Contractors Act, and presence of provision explicitly invalidating contracts entered into in violation of Home Improvement Act, suggested that legislature did not intend for noncompliant new home construction contracts to be deemed invalid or unenforceable); see generally *Asylum Hill Problem Solving Revitalization Assn.* v. *King*, 277 Conn. 238, 256–57, 890 A.2d 522 (2006) ("[when] a statute, with reference to one subject contains a given provision, the omission of such provision from a similar

statute concerning a related subject . . . is significant to show that a different intention existed" [internal quotation marks omitted]). The contrast in treatment strongly undermines the notion that there is a public policy against commercial lessors recovering rent if they have failed to secure a certificate of occupancy for the premises.

The defendants claim, however, that "[i]t is well settled in Connecticut case law that a landlord may not collect rents for a building for which he does not have a certificate of occupancy." In support of this "well settled" proposition, the defendants cite one case, *Conaway* v. *Prestia*, 191 Conn. 484, 464 A.2d 847 (1983). Their reliance on this case is misplaced. *Conaway* involved a class action by a group of tenants seeking recovery of rental payments and other relief against the landlord owners of the apartment buildings where the tenants had resided. Id., 487–88. The tenants claimed that the landlords had violated various statutes by failing to provide habitable apartments and by collecting rent without having obtained a certificate of occupancy for the apartments, and that these violations constituted unfair or deceptive trade practices under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Id. The trial court rendered judgment in favor of the tenants, concluding that the landlords' actions had violated the applicable revisions of General Statutes §§ 47a-5 and 47a-57[9] and CUTPA.

---

[9] Because the leases in *Conaway* were in effect in 1979 and 1980, the 1979 revision of the statutes was applicable. General Statutes (Rev. to 1979) § 47a-5 provides: "In any borough, city or town wherein a certificate of occupancy is required prior to human habitation of any building located therein, if any building is occupied in whole or in part without such occupancy permit, no rent shall be recoverable by the owner or lessor of the premises for such period of unlawful occupation."

General Statutes (Rev. to 1979) § 19-347r, which was transferred to § 47a-57 in 1981, provides in relevant part: "(a) No apartment in any structure containing three or more housing units in any municipality which adopts the provisions of this section by vote of its legislative body shall be occupied for human habitation, after a vacancy, until a certificate of occupancy has

Id., 488. Specifically, "[t]he trial court found that the apartments 'were uninhabitable and constituted a serious threat to the health and welfare of the plaintiff occupants,' and that therefore the defendants had failed to discharge their responsibilities pursuant to § 47a-7. Accordingly, the court enjoined the defendants from evicting the plaintiffs [for nonpayment of rent]; see General Statutes § 47a-4a; and from any further collection of rents without first obtaining certificates of occupancy." *Conaway* v. *Prestia*, supra, 488. On appeal, this court concluded, inter alia, that the defendants had a clear duty under § 47a-57 to obtain a certificate of occupancy and that §§ 47a-5 and 47a-57 prohibited an owner or lessor from recovering rent if there was no certificate. Id., 490–91. The court further noted, with respect to the plaintiffs' CUTPA claim, that "the defendants' actions of receiving the rent, while not specifically prohibited pursuant to §§ 47a-5 and 47a-57, unquestionably offended the public policy, as embodied by these statutes, of insuring minimum standards of housing safety and habitability." Id., 493.

Several factors explain why *Conaway* does not stand for the proposition asserted by the defendants in the

been issued by the person designated by such legislative body of such municipality to administer the provisions of this section, certifying that such apartment conforms to the requirements of the applicable housing ordinances of such municipality and this chapter; provided no provision of this section apply to any structure occupied by the owner thereof and containing three or less housing units; and provided further, no provision of this section shall be construed to prohibit human occupancy of such apartment during the pendency of an application of such certificate. . . .

"(b) No rent shall be recoverable by the owner or lessor of such structure for the occupation of any apartment for which a certificate of occupancy has not been obtained prior to the rental thereof in violation of subsection (a) of this section. . . ."

We note that *Conaway* cited to § 47a-57, rather than § 19-347r, presumably because the provision since had been transferred. See *Conaway* v. *Prestia*, supra, 191 Conn. 485 and n.3. For reasons of clarity and convenience, we do the same.

present case. First and foremost, this court's decision in *Conaway* was not predicated on public policy and our common-law authority. It was based on express statutory penalties provided under §§ 47a-5 and 47a-57; see id., 490; which at that time precluded an owner or lessor from recovering rent if there was no certificate of occupancy prior to occupancy. See footnote 9 of this opinion. Second, the certificate of occupancy referenced in §§ 47a-5 and 47a-57 is not the same certificate of occupancy referred to in § 29-265 (a). Certificates of occupancy under the former sections are issued only if a town elects to require them, certify that residential units conform with applicable municipal housing requirements and the health and safety standards mandated under chapter 833a of the General Statutes, and, where applicable, are required after each rental vacancy. See *Conaway* v. *Prestia*, supra, 191 Conn. 486; *Green Rock Ridge, Inc.* v. *Kobernat*, 250 Conn. 488, 492 n.7, 493 n.9, 736 A.2d 851 (1999). Certificates of occupancy under § 29-265 (a) are mandatory, certify that the building or structure conforms to the State Building Code, but are issued only when a building or structure is erected or altered. See footnote 1 of this opinion. Third, even if we were to presume that all the certificates of occupancy serve the same general purpose, in 1997, the legislature amended the statutes at issue in *Conaway* to remove the bar on recovery of rents in favor of a civil penalty of not more than $20 per day, per unit, for a period not to exceed 200 days.[10]

---

[10] General Statutes § 47a-5 currently provides: "In any borough, city or town which requires a certificate of occupancy prior to human habitation of any building located therein, if any building is occupied in whole or in part without such occupancy permit, the owner or lessor of the premises shall be liable for a civil penalty of not more than twenty dollars per day, per apartment or dwelling unit, for not more than two hundred days for such period of unlawful occupation."

General Statutes § 47a-57 currently provides in relevant part: "(a) An apartment or dwelling unit in any structure containing three or more housing units in any municipality which adopts the provisions of this section by vote of its legislative body shall not be occupied for human habitation, after

See Public Acts 1997, No. 97-231, §§ 4 and 5. Therefore, *Conaway* does not support the conclusion that Connecticut has a public policy against a commercial landlord recovering rent if it has failed to obtain a certificate of occupancy in accordance with § 29-265 (a).

The second conclusion we can draw from the residential tenancy scheme of penalties, which is consistent with this court's decision in *Conaway*, is that the public policy it evidences is one of protecting tenants from conditions that *materially* affect health and safety. See General Statutes § 47a-7 (a) (1) (prescribing landlord's obligation to "[c]omply with . . . all applicable building and housing codes *materially* affecting health and safety" [emphasis added]). There is nothing to suggest that a de minimis violation of a state or local building or housing code that has no such effect would bar recovery of rent. Therefore, even if we were persuaded that the public policy underpinnings of the residential tenancy scheme should afford equal penalties with respect to commercial tenancies, the defendants would have had to demonstrate that the plaintiff's failure to obtain a certificate of occupancy materially affected the health and safety of persons on the premises. They failed to do so.

The defendants never alleged that there were any conditions on the premises that posed any such threat. Indeed, they have pointed to no evidence in the record

---

a vacancy, until a certificate of occupancy has been issued by the person designated by the legislative body of such municipality to administer the provisions of this section, certifying that such apartment or dwelling unit conforms to the requirements of the applicable housing ordinances of such municipality and this chapter. . . .

"(c) Any owner or lessor who recovers rent for the occupation of any apartment or dwelling unit for which a certificate of occupancy has not been obtained prior to the rental thereof in violation of subsection (a) of this section shall be liable for a civil penalty of not more than twenty dollars per day for not more than two hundred days for such period of unlawful occupation. . . ."

establishing the basis for the town's refusal to issue the certificate of occupancy, and the trial court made no findings in that regard. Testimony from an East Hartford town official, however, suggests that the town's decision not to issue the certificate principally related to a dispute that the town had with the plaintiff as to zoning issues affecting another building the plaintiff owned that shared the same parcel of land as the building rented to the defendants.[11] More significantly, that testimony indicates that the town was aware that the subject property was being occupied without a certificate of occupancy and continued to work with the plaintiff to resolve the outstanding issues rather than take any action to remove the defendants. Such inaction strongly suggests that the town did not have safety concerns about occupation of the premises. Accordingly, we reject the defendants' claim that it would contravene public policy to allow the plaintiff to recover rent.

## II

We next turn to the defendants' claim that the trial court improperly adopted the plaintiff's calculation of interest on the damages. Specifically, they contend that the court improperly granted the plaintiff's request for postjudgment interest of 25 percent when General Statutes § 37-3a[12] only permits interest of 10 percent com-

[11] There was evidence submitted to show that the plaintiff had applied for a certificate of occupancy, and that the town had held the plaintiff's check submitted in support of the application without granting or denying the application. Donald J. Vigneau, the director of inspections and permits for the town of East Hartford who had testified on behalf of the defendants, indicated that the plaintiff's application for a certificate of occupancy had been held up principally because the town was attempting to resolve outstanding zoning violations for the building owned by the plaintiff that was located on the same parcel of land as the building that the plaintiff had rented to the defendants. It is not clear from Vigneau's testimony whether there may have been some building code violations on the subject building as well.

[12] General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or

pounded on the judgment. The defendants' claim lacks merit.

In its complaint, the plaintiff sought prejudgment, not postjudgment, interest under § 37-3a. That section permits recovery of "interest at the rate of ten per cent a year, and no more . . . as damages for the detention of money after it becomes payable." General Statutes § 37-3a (a). As we previously have noted, the trial court awarded to the plaintiff $10,400 in damages for the unpaid rent, $2551.43 in interest on the rent, $1476.30 in damages for unpaid services and $295.26 in interest on the services. Although on its face, the interest appears to be approximately 25 percent of the damages award, the defendants entirely overlook a significant fact. The plaintiff sought interest on money withheld for *approximately a two year period* prior to judgment. Specifically, in its memorandum in support of its claims for damages, the plaintiff calculated interest at a rate of 10 percent per year on: (1) the unpaid rent from November, 2003, until March, 2006; and (2) the unpaid services from March 5, 2004, through March 5, 2006. Therefore, the trial court properly adopted the plaintiff's figures in accordance with the maximum allowable interest rate of 10 percent *per year* permitted under § 37-3a.

The judgment is affirmed.

In this opinion the other justices concurred.

---

arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."