W. FREDERICK RAVETTO *v*. TRITON THALASSIC
TECHNOLOGIES, INC., ET AL.

RAYMOND BARTKO *v*. TRITON THALASSIC
TECHNOLOGIES, INC., ET AL.
(SC 17792)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 7, 2007—officially released March 4, 2008

*Jeffrey S. Bagnell*, with whom, on the brief, was *Stephen P. Horner*, for the appellants-appellees (plaintiffs).

*William G. Ballaine*, pro hac vice, with whom was *Christopher G. Fretel*, pro hac vice, for the appellees-appellants (defendants).

*Marc P. Mercier* filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.

*Opinion*

VERTEFEUILLE, J. This consolidated appeal[1] arises out of separate actions[2] brought by the plaintiffs, W. Frederick Ravetto and Raymond Bartko, former employees[3] of the named defendant, Triton Thalassic Technologies, Inc. (Triton), wherein the plaintiffs alleged that Triton and the defendant Barry Ressler[4] had failed to pay them wages in accordance with the provisions of General Statutes §§ 31-71a to 31-71i, inclusive. Pursuant to General Statutes § 31-72,[5] the plaintiffs

---

[1] The plaintiffs appealed, and the defendants cross appealed, from the judgments of the trial court to the Appellate Court. We transferred both the appeal and the cross appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199.

[2] The trial court consolidated the two separate actions before trial.

[3] We refer to Ravetto and Bartko collectively as the plaintiffs, and individually by name when appropriate.

[4] The plaintiffs' complaints named Triton and Ressler, Triton's president and chief executive officer, as the defendants. We refer to them collectively as the defendants, and individually by name when appropriate. On motion of Triton and Ressler, International Charter Group, Inc., was impleaded and made a third party defendant. International Charter Group, Inc., however, is not a party to this appeal.

[5] General Statutes § 31-72 provides: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer

sought to recover the unpaid wages, double damages, costs, interest and attorney's fees. Bartko also sought damages resulting from Triton's failure to repay in a timely manner a loan he made to the company from his retirement account. Ravetto's claim was tried to the court and the parties agreed to have Bartko's claim decided on the briefs. The plaintiffs now appeal and the defendants cross appeal from the judgment of the trial court, concluding that the plaintiffs were not entitled to double damages and attorney's fees under § 31-72 and that Ravetto was not obligated to repay the excess advances on unearned commissions.

· In their appeal, the plaintiffs assert that the trial court improperly: (1) concluded that the plaintiffs were not entitled to double damages and attorney's fees under § 31-72; (2) failed to award the plaintiffs 12 percent prejudgment interest for unpaid wages pursuant to General Statutes §§ 31-265[6] and 31-72; and (3) failed to award Bartko damages resulting from Triton's failure

shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person."

[6] General Statutes § 31-265 provides: "Contributions unpaid on the date on which they are due and payable in accordance with the provisions of [the Unemployment Compensation Act] shall bear interest for each month or fraction thereof after such date until payment, plus accrued interest, has been received by the administrator, provided no person shall be required to pay interest for any period during which he may have performed military service in the armed forces of the United States or of the United Nations subsequent to June 25, 1950. The administrator may prescribe fair and reasonable regulations whereby interest shall not accrue during the first five calendar quarters that any employer is subject to this chapter. Interest collected pursuant to this section shall be paid into the Employment Security Special Administration Fund. For purposes of this section, the interest rate on such unpaid contributions shall be determined by the administrator, on the last banking day in October of each calendar year, for use in the succeeding calendar year, and shall be two per cent per annum plus a simple average of the prime lending rates on such date at the three largest commercial banks in the state in terms of total assets, except that in no event shall the interest on unpaid contributions be less than twelve per cent per annum."

to repay his loan in a timely manner. In their cross appeal, the defendants claim that the trial court improperly concluded that Ravetto was not obligated to repay advances that he had received against unearned commissions based on the absence of any language in the employment agreement expressly requiring that Ravetto make such repayment. We affirm the judgment of the trial court.

The trial court reasonably found the following facts. Triton was founded in August, 1994, by Ressler and others, to develop and market a technology that uses a monochromatic light source to treat and control bacteria and viruses in certain fluids. In June, 2000, Bartko entered into an employment agreement with Triton, in which the parties agreed that Bartko would be paid an annual salary of $90,000 for the position of engineering manager. Bartko began his employment with Triton on August 1, 2000.

In January, 2001, Ravetto entered into an employment agreement with Triton, in which the parties agreed that Ravetto would be employed in the position of vice president of sales, for which he would be paid an annual base salary of $110,000. In addition, he would be paid a commission on product sales to certain industries. The agreement further gave Ravetto the right to take a draw against his future commissions during each pay period. Ravetto began his employment with Triton on February 1, 2001.

On September 30, 2001, Ressler met with all employees of Triton and advised them that, due to financial difficulties, Triton could not meet its payroll. He further stated that he could not ask the employees to continue working for Triton because it could not pay them. Ressler gave all employees the opportunity to resign, and four employees did so. The remaining employees, including the plaintiffs, continued working with the

hope that the company would obtain the funds needed to pay them. Ressler referred to the employees who continued working without payment as employees who were working "on a deferred compensation basis." Ressler had told the remaining employees that Triton would make every effort to obtain funding to pay them, but he did not guarantee the employees that they would be paid. The plaintiffs nevertheless voluntarily chose to remain at Triton and continue working.

On January 16, 2002, during another employees' meeting, Ressler again reviewed Triton's poor financial position. He employed a power point presentation during which he informed employees that Triton could not ask them to work if it could not meet payroll obligations. The plaintiffs nevertheless continued working for Triton.

Thereafter, on March 11, 2002, Ressler convened a final employees' meeting. Triton issued a memorandum to all of its employees, informing them that: "Effective [immediately], all employees will be furloughed until further notice. On a person by person basis, we may ask some of you to provide services on an assigned, independent contractor basis." Bartko continued working for Triton on a contract basis until March 25, 2002. Ravetto did not continue his employment with Triton after March 11, 2002.

Approximately one month later, Ravetto and Bartko filed separate claims with the state department of labor seeking unpaid wages in the amounts of $88,356 and $41,725.32, respectively. The plaintiffs thereafter withdrew their complaints with the department of labor and brought these actions in the Superior Court, seeking unpaid wages, attorney's fees, costs, prejudgment interest, and double damages. Bartko's complaint also sought damages for breach of contract for Triton's fail-

ure to repay the $50,000 loan that he had made to the company.

On March 31, 2004, while the actions were pending in the trial court, Triton made payments to Ravetto and Bartko. Triton paid Ravetto his unpaid wages plus interest, less $40,000 in advances that had been paid to Ravetto that exceeded his actual commissions earned. Triton paid Bartko all of his unpaid wages plus interest. On April 4, 2005, Triton repaid Bartko the principal and interest on the loan that he had made. Prior to trial, therefore, the plaintiffs had been paid their wages, and Bartko had been paid his loan.

After the trial court consolidated the two actions, Ravetto's claim was tried to the court, and the parties agreed that Bartko's claim could be decided by the court on the briefs. The trial court concluded that: (1) the plaintiffs were not entitled to double damages and attorney's fees pursuant to § 31-72 because they failed to establish that the defendants acted with bad faith, arbitrariness or unreasonableness; and (2) with regard to the calculation of Ravetto's unpaid wages, the defendants improperly had deducted the excess advances over actual commissions because Ravetto's employment agreement did not contain any express language requiring him to reimburse the company if the advances exceeded commissions earned. This appeal and the cross appeal followed. Additional facts will be set forth as necessary.

I

The plaintiffs first claim that the trial court improperly concluded that they were not entitled to double damages and attorney's fees under § 31-72 for the defendants' failure to pay their wages in a timely manner. Specifically, the plaintiffs assert that the defendants'

salary deferral plan[7] was unreasonable as a matter of law. The plaintiffs also assert that the trial court's factual finding that the defendants did not induce the employees to remain at work without pay was clearly erroneous. We disagree with the plaintiffs.

Section 31-72 provides in relevant part that "[w]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k . . . such employee . . . may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court . . . ." The statute provides for "a discretionary award of double damages, with costs and reasonable attorney's fees, to employees who are successful in actions against their employers for wages due." *Crowther* v. *Gerber Garment Technology, Inc.*, 8 Conn. App. 254, 265–66, 513 A.2d 144 (1986) (affirming judgment of trial court awarding double damages and attorney's fees where employer unilaterally reduced employee's commission rate despite employment agreement). Although § 31-72 does not set forth a standard by which to determine whether double damages should be awarded in particular cases, "it is well established . . . that it is appropriate for a plaintiff to recover attorney's fees, and double damages under [§ 31-72], only when the trial court has found that the defendant acted with bad faith, arbitrariness or unreasonableness." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210,

[7] In their briefs, the plaintiffs refer to a "salary deferral plan" or "deferred salary plan." The trial court, however, made no finding that the defendants formally had established a deferred compensation plan. Indeed, the trial court only referred to a "deferred compensation" plan or "deferred salary" plan by using quotation marks. Accordingly, we use the term "salary deferral" to refer to the defendants' acceptance of the plaintiffs' continued employment after September 30, 2001, with the hope to pay the employees at a later date if Triton acquired the funds to do so.

269, 828 A.2d 64 (2003), quoting *Sansone* v. *Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991).

## A

The plaintiffs' claim that they were entitled to double damages and attorney's fees because the defendants' salary deferral was unreasonable as a matter of law presents a question of law. Our review of a question of law is plenary. *A & M Towing & Recovery, Inc.* v. *Guay*, 282 Conn. 434, 440, 923 A.2d 628 (2007).

The plaintiffs claim that, as a matter of law, it was unreasonable for the defendants to permit employees like the plaintiffs to continue working with the hope that they could be paid in the future if Triton obtained adequate funding. The plaintiffs assert that the defendants were obligated to terminate the employment of Triton's employees once Triton became unable to meet payroll because of financial difficulties.

We recognize that the wage statutes were designed to "[effectuate] the statutory policies of compensating employees and deterring employers from failing to pay wages." *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 463, 704 A.2d 222 (1997). We cannot conclude as a matter of law, however, that an employer experiencing financial hardship that honestly informs employees that it cannot meet payroll and that does not promise them that future payment will be made is acting unreasonably when it allows employees to continue to work with the hope of future payment. This is particularly true where the employees are experienced business people and members of management who choose to continue working in the hope that their services to the employer will improve the financial status of the company. We can imagine circumstances in which such a choice by employees may inure to their benefits particularly when the financial hardship is short-lived and the financial status of the company ulti-

mately improves. In the present case, we recognize that Triton ultimately did pay the plaintiffs the wages that were due them. Determinations of reasonableness are especially fact bound. See *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 580, 657 A.2d 212 (1995) (citing cases from variety of contexts wherein "[w]e have consistently held that reasonableness is a question of fact for the trier to determine based on all the circumstances"). On the basis of the facts of the present case, we cannot conclude that the defendants' salary deferral was unreasonable as a matter of law.

The plaintiffs rely on a series of out-of-state cases to support their claim that the defendant's salary deferral plan was unreasonable as a matter of law. We are unpersuaded. These cases are wholly unrelated to claims for unpaid wages. For example, the plaintiffs cite *National Collegiate Athletic Assn.* v. *Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984), which involved an antitrust claim related to the National Collegiate Athletic Association's plan for televising football games. The plaintiffs also cited *Dinaco, Inc.* v. *Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir. 2003), which involved a contract claim between two corporate entities for unpaid debt wherein the court concluded that the plaintiff entity's reliance on the apparent authority of an alleged joint venturer of the defendant entity was "unreasonable as a matter of law." In *White* v. *Roche Biomedical Laboratories, Inc.*, 807 F. Sup. 1212, 1219–20 (D.S.C. 1992), the United States District Court for the District of South Carolina rejected the plaintiff employee's claim of promissory estoppel on the ground that the employee's reliance on a promise of at-will employment was "unreasonable as a matter of law . . . ." The plaintiffs in the present case also cited one case from the Appellate Court, *Jones* v. *Ippoliti*, 52 Conn. App. 199, 200–201, 727 A.2d 713 (1999), which involved, inter alia, a claim under the Connecticut

Unfair Trade Practices Act, General Statutes § 42-110a et seq., in a construction dispute. None of these cases provides any support for the plaintiffs' contention that an employer's permitting employees to continue to work voluntarily without current compensation with the intention of paying those employees in the future if funding becomes available is unreasonable as a matter of law.

B

The plaintiffs also contend that the trial court's factual finding that the defendants did not induce the plaintiffs to continue working for Triton was clearly erroneous. The plaintiffs claim, more particularly, that it was "logically impossible" for them to have agreed to continue working voluntarily without having been induced to do so by the defendants. We disagree.

Whether the plaintiffs were induced to continue working is a question of fact. "Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107, 897 A.2d 58 (2006); see Practice Book § 60-5.

In the present case, the trial court set forth its factual findings and conclusions of law in a written memorandum of decision. The court noted that in several unpaid wage cases wherein double damages had been awarded, there had been evidence that employees were induced to continue working by false promises of payment. The trial court then continued, "[t]here is no such proof in

this case. The defendant corporation simply could not meet payroll and so advised its employees including the two plaintiffs on September 30, 2001. Some employees left immediately, but the plaintiffs voluntarily decided to remain at work under a 'deferred salary plan.' The defendants did not guarantee that the deferred salary would ever be paid, but only that Triton would make every effort to do so, which it did on March 31, 2004, with interest. The employer did not induce the employees to remain at work without pay but told them clearly that there was no guarantee of payment if they wanted to remain at work."

"It is well established that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007).

In the present case, the trial court credited Ressler's testimony, as it was entitled to do. Ressler testified that he had met with all of the employees, including the plaintiffs, on more than one occasion and had informed them that Triton would not be able to make payroll. Ressler further testified that he had explained to all of the employees, including the plaintiffs, that Triton could not ask them to stay if it could not pay them, and that he had given every employee, including the plaintiffs, the opportunity to resign. Ressler also testified that the

defendants never guaranteed that the employees who remained working for Triton would be paid, only that Triton would try to pay them if it received adequate funding to do so. Additional evidence before the trial court demonstrated that Ravetto and Bartko were both experienced businessmen, who, as vice president of sales and engineering manager, respectively, sufficiently were aware of Triton's financial status to understand that they were not guaranteed payment for their continued services after September 30, 2001. We must defer to the trial court's assessments concerning credibility; see id.; and, therefore, we conclude that the evidence amply supported the trial court's finding that the defendants did not induce the plaintiffs to remain employed. Accordingly, we conclude that the trial court's factual finding was not clearly erroneous.

## II

The plaintiffs' second claim on appeal is that the trial court improperly failed to award the plaintiffs 12 percent prejudgment interest on their unpaid wages pursuant to §§ 31-72 and 31-265. The plaintiffs contend that those statutes required the trial court to award 12 percent prejudgment interest on the plaintiffs' unpaid wages, instead of the 4 percent that the defendants voluntarily had paid. In response, the defendants assert that the plaintiffs did not raise this claim in the trial court, and, therefore, it is not preserved for appellate review. We agree with the defendants.

In their complaints in the present cases, the plaintiffs included a general claim for prejudgment interest in their demand for relief. The plaintiffs did not cite any statute or other authority for their request of prejudgment interest, nor did they indicate the specific interest rate that they were seeking. The record and the transcript of the proceedings demonstrate that the plaintiffs never raised the issue of prejudgment interest at trial,

in their briefs, or by motion. In its memorandum of decision, the trial court awarded Ravetto $40,650 in damages, representing the commission advances paid to him and subsequently subtracted by the defendants when they calculated his unpaid wages, plus 4 percent interest, which was consistent with the rate of interest that the defendants voluntarily had paid the plaintiffs on their back wages. The plaintiffs thereafter never filed any motion asking the trial court to award the 12 percent interest that they now claim it improperly failed to award.

"Practice Book § 60-5 provides in relevant part that [t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . Indeed, it is the appellant's responsibility to present such a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal. . . . For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge. . . . We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal." (Citation omitted; internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 265. Accordingly, we conclude that the plaintiffs failed properly to preserve this issue for appellate review.

### III

The final claim in the appeal is Bartko's assertion that the trial court improperly failed to award him consequential damages resulting from Triton's failure to repay timely the loan that he had made to the company. Specifically, Bartko asserts that, because the loan he made to Triton had come from his 401k account, Triton's failure to repay the loan in sixty days as agreed forced Bartko to report the withdrawal from his 401k account as personal income and pay early withdrawal penalties on the money. We conclude that the record is inadequate to decide this issue, which was not addressed by the trial court.

The record reflects the following additional facts. In 2001, after learning of Triton's bleak financial situation, Bartko offered to loan $50,000 to Triton. On November 1, 2001, Triton executed a $50,000 promissory note, which was due and payable on December 31, 2001, with interest at a rate of 5.5 percent per year. Triton did not repay the loan by December 31, 2001. On April 4, 2005, Triton paid Bartko $60,035, representing the entire principal balance plus 5.5 percent annual interest to March 31, 2005.

Bartko's complaint in this matter included a breach of contract claim against the defendants for their default on the promissory note and claimed both harm and detriment resulting from the nonpayment. He briefed this claim for damages related to the tax penalty in his posttrial brief. In its memorandum of decision, however, the trial court stated that "the only issue in the Bartko case is whether he is entitled to double damages pursuant to . . . § 31-72. . . . [Bartko] is not entitled to such damages."

"This court recently has reiterated the fundamental point that [i]t is incumbent upon the [appellant] to take the necessary steps to sustain [his] burden of providing

an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the appellant's claims] would be entirely speculative." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 583–84, 916 A.2d 767 (2007).

In the present case, it is unclear from the trial court's memorandum of decision why it did not award Bartko consequential damages for Triton's failure to repay the loan on time. In other words, the trial court could have failed to award such damages for any number of reasons, such as factual insufficiency or a legal conclusion that such damages were not recoverable under the terms of the promissory note. Alternatively, the trial court simply may have forgotten to address Bartko's claim for such damages. See *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 685, 911 A.2d 300 (2006).

"Under these circumstances, the plaintiff should have filed a motion for articulation to preserve an adequate record for review. See Practice Book §§ 61-10[8] and 66-5.[9]

[8] Practice Book § 61-10 provides: "It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. For purposes of this section, the term 'record' is not limited to its meaning pursuant to Section 63-4 (a) (2), but includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety."

[9] Practice Book § 66-5 provides in relevant part: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. Any motion filed pursuant to this section shall state with particularity the relief sought. . . .

"If any party requests it and it is deemed necessary by the trial court, the trial court shall hold a hearing at which arguments may be heard, evidence taken or a stipulation of counsel received and approved. The trial court may make such corrections or additions as are necessary for the proper

It is well established that [a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . In the absence of an articulation, we are unable to determine the basis for the court's decision, and we therefore decline to review this claim." (Citation omitted; internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, supra, 280 Conn. 685–86.

Because Bartko failed to seek an articulation from the trial court, we are unable to determine the basis for the court's failure to address his claim. Accordingly, we decline to review it.

## IV

In their cross appeal, the defendants claim that the trial court improperly concluded that Ravetto was entitled to retain the advances paid to him against commissions that ultimately were not earned. The defendants contend that the trial court's conclusion was based on an incorrect construction of Connecticut law. Ravetto asserts in response that the trial court properly concluded that he could retain the excess advances because the defendants did not establish that there was an express or implied agreement requiring him to repay the excess advances. We agree with Ravetto.

The following additional facts reasonably found by the trial court are relevant to the resolution of the cross appeal. Ravetto's employment agreement with Triton included a provision for the payment of commissions on sales of Triton products to certain industries. The

presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk. . . ."

agreement permitted Ravetto to take a draw every pay period against these future commissions. Once Ravetto began working for Triton in February, 2001, he began receiving approximately $2700 per pay period as an advance on commissions to be earned in the future. When Ravetto ended his employment with Triton, the advances that he had taken exceeded the commissions that he had earned by approximately $40,000. When Triton paid Ravetto for his unpaid wages in March, 2004, the company deducted approximately $40,000 from the wages that it had calculated that he was owed.

At trial, Ravetto claimed that the defendants improperly had deducted these advances from the back wages that it owed him. The defendants asserted that Ravetto was obligated to repay the excess advances under the terms of the agreement. More specifically, the defendants claimed that the use of the term "advance" in the agreement established that Ravetto was required to repay the excess unearned commissions. The defendants further claimed that because the terms of the employment agreement were clear and unambiguous, any evidence beyond the four corners of the agreement was irrelevant to determining whether Ravetto was obligated to repay the excess advances.

The trial court concluded that an employee is not required to repay excess advances unless the parties expressly or impliedly agree that he or she would do so. The trial court cited *Sutton* v. *Avery*, 132 Conn. 397, 399, 44 A.2d 701 (1945), in support of its conclusion that an employer is not entitled to reimbursement of excess advances in the absence of an express or implied agreement by the employee to reimburse the employer. The trial court found that "[t]he written employment agreement in this case is silent as to whether an employee is required to pay back excess advances. It does not contain any express language on reimbursement of unearned commissions. Ravetto never agreed

to repay advances in excess of earned commissions. Accordingly, Ravetto is entitled to retain excess advances and Triton owes him the $40,650 that it improperly subtracted from the wages paid him . . . ."

We first set forth the appropriate standard of review. "[T]he scope of our appellate review depends [on] the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Kelly* v. *Stop & Shop, Inc.*, 281 Conn. 768, 776, 918 A.2d 249 (2007). Because the defendants' sole claim on appeal is that the trial court incorrectly construed and applied Connecticut law, our review is plenary. See id.

On appeal, the defendants claim that the trial court improperly relied on *Sutton* v. *Avery*, supra, 132 Conn. 399, in support of its conclusion that an employee is not required to repay excess advances unless the parties expressly or impliedly agreed that he or she would do so. The defendants contend that the trial court's reliance on *Sutton* is improper because this court did not reach a conclusion in *Sutton* as to the issue in the present case. We agree with the defendants. In *Sutton*, the plaintiff employed the defendant to sell baby chicks on a commission basis. Id., 397. The parties agreed that if the defendant's commissions did not cover his living and travel expenses, the plaintiff would pay him the difference. The plaintiff and the defendant operated under this agreement for approximately six months, with the plaintiff paying the defendant weekly sums that totaled $387.25. Id., 398. The plaintiff thereafter sued the defendant claiming that the amounts paid were

loans that had to be repaid. This court concluded that the defendant was not liable to repay these amounts because the agreement between the parties "amounted to a contract by the plaintiff to guarantee a weekly return to the defendant of an amount equal to the latter's minimum requirements for living and traveling expenses." Id. This court later went on to state, in dicta, that, "[e]ven if the advances were to be regarded as sums to be deducted from future commissions, the weight of authority is against recovery." Id., 399. We agree with the defendants in the present case that, because this court did not construe the agreement between the parties in *Sutton* as providing for advances to be offset against future commissions, but, rather, to provide a weekly guaranteed return to the defendant therein, this court did not decide the issue of whether excess advances against commissions must be repaid in the absence of a contractual obligation to do so.

Both parties and the trial court also cite to *Valoco Building Products, Inc.* v. *Chafee*, 4 Conn. Cir. Ct. 322, 231 A.2d 101 (1966). In that case, the Connecticut Circuit Court held that an employer could not recover excess advances against unearned commissions when there had been no express or implied agreement requiring the employee to repay such excess advances. Id., 326. In support of its conclusion, the court cited *Sutton* when stating that, "Connecticut has adopted the majority rule that, where advances made to a salesman are charged against commissions earned, he is not required to pay excess of advances over commissions unless it has been expressly or impliedly agreed that he do so." Id., 323. As set forth previously herein, we disagree with the court's characterization of *Sutton* in *Valoco Building Products, Inc.*, as adopting a general rule addressing whether an employee is obligated to reimburse an employer for advances against unearned com-

missions when the contract between the parties is silent concerning reimbursement.

The issue, however, is presented to us squarely by the cross appeal in the present case. As we consider it, we are mindful that this issue "is a matter of policy for the court to determine based upon competing concerns in society." (Internal quotation marks omitted.) *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 216, 837 A.2d 759 (2004).

A number of courts in other states have examined whether an employee is obligated to repay advances that exceed earned commissions. These courts recognize that whether an employer is entitled to recover advances in excess of earned commissions generally is a question of contract interpretation. See, e.g., *Shaler Umbrella Co.* v. *Blow*, 199 Wis. 489, 492, 227 N.W. 1 (1929) ("the purpose [in construing a contract] is to discover the intent of the parties"). "Whether or not money given by a principal is given as an advance and is to be repaid by the agent in the event that his commission or other compensation does not amount to the sum advanced, is dependent upon the interpretation of the contract between them." 2 Restatement (Second), Agency § 382, comment (d), p. 186 (1958). "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 610, 849 A.2d 804 (2004).

In construing these contracts to effectuate the intent of the parties regarding excess advances, the majority of the jurisdictions applies the general rule that if no express or implied contract for repayment is established, the employee is not liable to the employer for repayment of advances that exceed earned commissions. See, e.g., *Kennesaw Life & Accident Ins. Co.* v. *Hendricks*, 108 Ga. App. 148, 151, 132 S.E.2d 152 (1963) ("[a] prerequisite to the right of the principal to recover the excesses of advances over earned commissions, under the authorities cited, is the existence of an 'express or implied agreement, or promise to repay' such excesses"); *Perma-Home Corp.* v. *Nigro*, 346 Mass. 349, 353, 191 N.E.2d 745 (1963) ("we adopt the rule which appears to prevail elsewhere, that in the absence of an express or implied agreement to repay any excess of advances over the commissions earned, the employer may not recover from the employee the amount of the excess"); annot., 32 A.L.R.3d 802, 806 (1970) ("the overwhelming preponderance of case law is to the effect that while the parties may provide in the agreement for personal liability, in the absence of language, or at least some evidence, indicative of such an intention, it will generally be presumed that no liability was intended, and that the principal's sole source of reimbursement was intended to be the fund contemplated, that is, the anticipated commissions, bonus, or profits").

In applying this general rule, the majority of these courts has concluded that the use of terms such as "advance" or "draw," standing alone, is not sufficiently indicative of the parties' intent to obligate the employee to repay the advances.[10] "It is pointed out that such a

---

[10] Liability of the employee has been established, however, in the absence of an express written agreement where other evidence establishes the parties' understanding or implied agreement that the employee was obligated to repay the excess advances. See, e.g.; *Argonaut Builders, Inc.* v. *Dare*, 145 Colo. 424, 429, 359 P.2d 366 (1961) (where employer maintained running record of employee's account and gave regular statements to employee

liability on the part of the [employee] does not necessarily arise from the agreement on the part of the employer to make certain advancements. To advance does not necessarily mean to loan." *Shaler Umbrella Co.* v. *Blow*, supra, 199 Wis. 491. "To advance is to bring forward. Standing by itself it means nothing more than that the company will 'forward' to [the employee] this money; they will take it from their treasury and put it in his hands." *North-western Mutual Life Ins. Co.* v. *Mooney*, 108 N.Y. 118, 124, 15 N.E. 303 (1888); see also *Richmond Dry Goods Co.* v. *Wilson*, 105 W. Va. 221, 225, 141 S.E. 876 (1928) ("without a promise to repay, express, or fairly to be implied from the agreement under which the advances were made, a promise to advance money for a particular purpose—as here, the furtherance of the defendants' business—does not import an expectation of its return personally by the person to whom the money was advanced" [internal quotation marks omitted]). We agree with the majority of courts that the mere use of the terms "draw" or "advance" in an employment agreement is not sufficient to establish the parties' intent that the employee is obligated to repay the excess advances.

showing charge back of losses as well as credit of profits, "intent of the parties, gathered from all of their dealings . . . lead to the contrary conclusion . . . that the [employee] should be liable to the extent that the charges exceeded the payments to him"); *Crosby* v. *East West, Inc.*, 278 Ga. App. 329, 331, 629 S.E.2d 41 (2006) (trial court's finding that employee was obligated to repay advances was supported by evidence that employee signed document stating amount owed from excess advances and establishing interest rate on that amount and employee's testimony that he never expected employer to " 'eat the cost' " of his advances); *Skweres* v. *Diamond Craft Co.*, 512 N.E.2d 217, 221 (Ind. App. 1987) (employee obligated to repay excess advances despite no express language in written agreement where evidence established that employee received for income reporting purposes both form 1099 for advances and form W-2 for other wages, employer withheld no taxes or social security contributions from payments on advances, and outstanding balance of excess advances was adjusted weekly with employee's knowledge and without his objection).

In arriving at the general rule that an employer may not recover excess advances unless an express or implied agreement to repay is established, many courts have reasoned that because the employer usually drafts the employment agreement, it easily may include language in the agreement obligating the employee to repay any advances that exceed commissions. See, e.g., *Shaler Umbrella Co.* v. *Blow*, supra, 199 Wis. 492 ("[w]here it is the intent of both parties that the [employee] shall repay the excess of advancements it is a simple matter to expressly so provide"). "[I]n an agreement so fully and minutely defining the duties and contract obligations of the agent, and the contract rights of the company . . . [i]t would have been much more natural to insert words signifying [the transaction between the employer and employee to be a loan], if it was so intended, than omit them, and much easier to say directly that [the employee] assumed a personal liability, if that were the fact, than to use words which require an extended argument on the part of counsel to satisfy a referee or court that such liability, although not expressed, may be inferred." *North-western Mutual Life Ins. Co.* v. *Mooney*, supra, 108 N.Y. 123–24. We find such reasoning persuasive.

Similarly, many of these courts have reasoned that, because the employer generally enjoys superior bargaining power in the employment relationship, it is incumbent upon the employer to make any obligation for reimbursement explicit in the employment agreement. "The majority rule is further predicated upon the obvious reality that the superior bargaining power of the employer in contracting with an agent or employee requires the imposition upon the employer of the duty of making explicit his rights under the contract agreement, particularly in situations where he demands the return of previously transferred funds." *Agnew* v. *Cameron*, 247 Cal. App. 2d 619, 624, 55 Cal. Rptr. 733

(1967), citing *Shaler Umbrella Co.* v. *Blow,* supra, 199 Wis. 489; *Joseph Toker, Inc.* v. *Cohen,* 67 N.J. Super. 68, 74–75, 169 A.2d 838 (1961). This court recently has acknowledged the superior bargaining power of an employer that enters into an employment contract with an employee. "[A]n employer . . . possesses a decisive advantage of bargaining strength against the . . . employee. Considering the economic compulsion facing those in search of employment . . . [t]o suppose that [an employee] . . . had any bargaining power whatsoever defies reality." (Internal quotation marks omitted.) *Brown* v. *Soh,* 280 Conn. 494, 504, 909 A.2d 43 (2006). We agree with this reasoning also.

The majority rule is further based on the rationale that, when an employee works for an employer on a commission basis, the employee and employer are engaged in a joint venture. See, e.g., *Agnew* v. *Cameron,* supra, 247 Cal. App. 2d 624; *Perma-Home Corp.* v. *Nigro,* supra, 346 Mass. 353; *Richmond Dry Goods Co.* v. *Wilson,* supra, 105 W. Va. 224; *Shaler Umbrella Co.* v. *Blow,* supra, 199 Wis. 491; annot., 32 A.L.R.3d 802, 806 (1970). If an employee were to be required to repay all excess advances when the business did not produce sufficient commissions to cover the advances, the entire risk of the joint undertaking would be placed unfairly on the employee, and such an outcome would be contrary to the nature of the relationship as a joint venture. Indeed, "the employee's undertaking is in the nature of a joint enterprise with the employer, the main object of which is the furtherance of the employer's business, and it is not to be assumed that the employee, in furnishing his time and ability, likewise assumes all the risk." *Agnew* v. *Cameron,* supra, 624.

We therefore agree with the majority of jurisdictions that "absent a contractual provision expressly holding [an employee] personally liable for advances, [an employer] must show that [the employee], by his [or

her] conduct, exhibited an intent to be held personally liable for the repayment of the advances." *SDJ Ins. Agency, LLC* v. *American National Ins. Co.*, 292 F.3d 689, 694 (10th Cir. 2002). This rule is consistent with the "well settled judicial reluctance to cause a forfeiture of money already received unless it convincingly appears that such a result was intended by the parties . . . ." *Agnew* v. *Cameron,* supra, 247 Cal. App. 2d 624. The trial court properly concluded that an employer that seeks reimbursement from an employee of advances that exceeded earned commissions has the burden of proving that the employee explicitly or impliedly agreed to repay any such excess advances.

In the present case, the defendants claimed in the trial court that the employment agreement was clear and unambiguous in establishing Ravetto's obligation to repay the excess advances, and relied on the use of the term "advance" to establish the repayment obligation. We agree with the trial court and the majority of other jurisdictions that the mere use of the term "advance" is not sufficient to establish an express repayment obligation.

On appeal in this court, the defendants now claim that the trial court improperly failed to determine whether there was an *implied* agreement between the parties that required Ravetto to repay the excess advances.[11]

---

[11] The dissenting and concurring opinion asserts that "the defendants repeatedly requested in their posttrial brief that the trial court examine evidence outside the four corners of the contract that the parties did not intend for Ravetto to retain advances against unearned commissions." We disagree. Although we acknowledge that the defendants argued that the circumstances surrounding the parties' contract negotiations should be considered by the trial court in interpreting the terms of the written agreement, we do not construe that assertion to raise the claim that the parties had an implied agreement that Ravetto would repay the excess advances. To the contrary, the defendants explicitly asserted in the trial court that any claim by the plaintiff that the parties had a separate arrangement (apart from the written agreement) was inadmissible. First, the defendants asserted that this evidence would be barred by the parol evidence rule because it would contradict the language of the contract. Second, the defendants further

As we previously have noted, however, the defendants disavowed any claim of an implied agreement in the trial court. We therefore decline to consider this claim on appeal because it was not raised at trial. See Practice Book § 60-5.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

ZARELLA, J., concurring in part and dissenting in part. I agree with the majority that the trial court prop-

claimed that evidence of a separate arrangement between the parties would be barred by the statute of frauds, General Statutes § 52-550, because it was not in writing and would not be performed within one year. Their assertion in the trial court that evidence of a separate arrangement between the parties would be inadmissible if proffered by the plaintiffs contradicts the defendants' claim on appeal that the parties had an "implied agreement" that Ravetto would repay the excess advances.

It is undisputed that the trial court determined only that the written agreement between the parties did not include an agreement that Ravetto would repay the excess advances. Accordingly, to the extent that the defendants asserted that the facts regarding the negotiations were relevant to interpreting the terms of the written agreement, we cannot conclude that the trial court failed to consider their claim. Instead, we conclude that the trial court properly considered the evidence presented and rejected the defendants' claim that, even in light of the evidence regarding the negotiations between the parties, the language of the contract did not reflect an agreement between the parties that Ravetto would repay the excess advances.

Moreover, if the defendants thought that the trial court's memorandum of decision failed to address one of their claims, it was their responsibility as the appellants on this claim to seek an articulation from the trial court. "It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue. . . . *Schoonmaker* v. *Brunoli*, [supra, 265 Conn. 232]; see also Practice Book §§ 60-5 and 66-5." (Internal quotation marks omitted.) *Dickinson* v. *Mullaney*, 284 Conn. 673, 680, 937 A.2d 667 (2007). Accordingly, even if the defendants had claimed in the trial court that the parties had an implied

erly determined that the plaintiffs, W. Frederick Ravetto and Raymond Bartko, were not entitled to double damages and attorney's fees and that Bartko was not entitled to damages for the failure of the named defendant, Triton Thalassic Technologies, Inc. (Triton),[1] to repay his loan to the company in a timely manner. I also agree with the majority that the plaintiffs did not preserve their claim that the trial court improperly had failed to award them prejudgment interest for unpaid wages. I disagree, however, with the majority's conclusion in part IV of its opinion that the trial court properly determined, without considering evidence of the parties' negotiations, that Triton was not entitled to recover advances to Ravetto in excess of earned commissions. Accordingly, I respectfully dissent in part.

The majority begins its analysis by acknowledging that "whether an employer is entitled to recover advances in excess of earned commissions generally is a question of contract interpretation." The majority then observes that "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) Part IV of the majority opinion, quoting *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 610, 849 A.2d 804 (2004). Instead of following these principles, however, the majority concludes that, although "the defendants claimed in the trial court that the employment agreement was clear and unambiguous . . . and relied on the use of the term 'advance' to establish the repayment obligation," the trial court properly determined

agreement, without a motion for articulation, the record is inadequate for us to review the claim.

[1] Barry Ressler, Triton's chief executive officer, also was named as a defendant. I refer to Triton and Ressler collectively as the defendants and individually by name.

that "the mere use of the term 'advance' is not sufficient to establish an express repayment obligation." I strongly disagree with this analysis because it fails to construe the term "advance" in the context of the parties' negotiations and other language in the employment agreement. Not only do long established principles of contract interpretation *require* consideration of "the situation of the parties and the circumstances connected with the transaction"; (internal quotation marks omitted) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, supra, 610; but the defendants repeatedly requested in their posttrial brief that the trial court examine evidence outside the four corners of the contract that the parties did not intend for Ravetto to retain advances against unearned commissions. Consequently, the trial court should have considered the parties' negotiations and other language in the contract in construing the term "advance."

The following additional undisputed facts are necessary to a full discussion of this issue. In the latter part of the year 2000, an executive recruiter informed Ravetto that Triton was searching for a vice president of sales and arranged an interview with the company. At that time, Ravetto was working for Nash Engineering Company (Nash) and was earning an annual salary of $160,000, plus a bonus. Ravetto was interested in exploring the position at Triton because Nash was losing money, and his bonus had declined over the previous five years.

During his interview at Triton in early December, 2000, Ravetto met with several individuals, including Triton's chief executive officer, Barry Ressler, to discuss the sales executive position. Thereafter, Ravetto wrote a letter to Ressler in which he summarized his approach to the job. Ravetto acknowledged that the company was "[a] startup effort to introduce a new technology to mature industrial markets" and would require "an aggressive sales program . . . ." He also

recognized that "[t]he sales ramp up can be 'lumpy' when a base business flow has not yet been established," that "[t]he major obstacle to overcome is the slowness of mature markets, such as those targeted [by Triton], to adapt to change" and that potential customers would "need to be *dislodged* from the risk averse patterns of the past." (Emphasis in original.) According to Ravetto, this would require an "aggressive and targeted" sales approach. Nevertheless, Ravetto declared that, despite these challenges, he was "keenly interested in pursuing the career opportunity at Triton."

In late December, 2000, Triton offered Ravetto the position of vice president of sales with an annual salary of $100,000, plus commissions. In an e-mail dated December 29, 2000, Ravetto rejected the offer, explaining that, although he felt that the "fit with Triton was excellent in terms of chemistry, culture, [his] respect for the management team, and also the product technology," and that the "long term potential upside was very attractive," he believed, after further reflection, that "the ramp up time for sales" would take about two years, which was longer than he originally had anticipated. Ravetto also observed that "[o]verall there is zero base business sales for Triton when the sales director walks in the door" and that he would earn only $10,000 in sales commissions during his first year of employment and $25,000 in commissions during his second year of employment, which, even when added to his base salary of $100,000, was too far below his present annual compensation of approximately $170,000 to make further negotiations worthwhile.

Ressler responded by e-mail on December 31, 2000, conceding that Triton was "a developing, emerging company" with "[l]imited resources and a lot of groundbreaking challenges . . . ." With respect to Ravetto's compensation, he stated: "[Y]our overall reasoning makes sense and *there is no way that we can*

*guarantee the outcome.*" (Emphasis added.) Although Ressler disagreed with Ravetto's projected sales numbers, he acknowledged that the product involved "new territory and it will require a significant effort on the part of the sales manager candidate and *I repeat, no guarantees.*" (Emphasis added.)

The parties reached an agreement that was formalized in a written offer from Ressler to Ravetto dated January 10, 2001. The offer provided that Ravetto would be paid an annual salary "of $110,000 in semi-monthly installments," plus a commission on sales to the automobile, paper and food industries. In an addendum to the agreement, the commission was calculated at 0.5 percent on the first $5 million of sales, 0.75 percent on the next $5 million of sales and 1 percent on sales between $10 million and $20 million for the first eighteen months of employment, starting February 1, 2001. The addendum also set forth (1) three levels of sales and the percentage commission that Ravetto would earn at each level, (2) the actual commission he would earn if sales reached the maximum within each level, (3) a hypothetical commission to be paid as an advance or as a commission earned based on sales, and (4) how much the projected advances would exceed earned commissions in the various hypothetical scenarios. The agreement further provided that Ravetto could choose to "take a 'draw' " on his sales commissions of "up to $2710 per pay period, up to a maximum advance of $65,000." This "bonus plan" would "remain in effect until sales force growth require[d] a reorganization." Changes to his compensation or the calculation thereof would be by mutual agreement. The offer also included a "10,000 share stock option" and a standard benefits package. Ravetto subsequently signed the offer, thereby accepting its terms and conditions.

On January 18, 2001, Ravetto signed a personnel form acknowledging receipt of Triton's personnel policies

and procedures manual. In signing the form, Ravetto also acknowledged: "No promises regarding employment or inducements to take employment have been made or offered to me other than in Triton's offer letter of employment and I understand and agree that no promises are binding upon Triton unless made in writing by [Ressler] . . . ." On January 23, 2001, Ravetto signed another personnel form entitled "personal employee profile," which described his position as "[s]alaried," with semi-monthly payments of $4583.33. After joining Triton, Ravetto elected to take the maximum advance on commissions permitted under the agreement.

Following a hearing in which the foregoing evidence was considered, the parties submitted posttrial briefs. In their briefs, each party referred to Ravetto's situation and the contract negotiations in support of their respective positions. The defendants specifically argued that the agreement's language should be interpreted in light of the parties' situation and the circumstances surrounding the transaction, and that the court should consider evidence "outside the four corners of the contract . . . ." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, supra, 269 Conn. 609. On the basis of these basic legal principles, the defendants contended that, because the dictionary definition of "advance" is "[t]o supply or *lend*, especially on credit"; (emphasis added) American Heritage Dictionary of the English Language (3d Ed. 1992); the advances were merely loans, and that there was no other language in the agreement to suggest that the parties considered advances in excess of earned commissions as guaranteed additional compensation. The defendants thus contended that all parties "understood" that the advances did not constitute additional, guaranteed, risk-free compensation to Ravetto.

Thereafter, the trial court declared in its November 4, 2005 memorandum of decision that "Connecticut has adopted the majority rule that, where advances made to a salesman are charged against commissions earned, he is not required to pay any excess of advances over commissions unless it is expressly or impliedly agreed that he do so." (Internal quotation marks omitted.) The court then determined, without considering any other contract provisions regarding the compensation package, or any other evidence of the parties' intent, including their negotiations, that, because the agreement contained no "express language on reimbursement of unearned commissions, Ravetto never agreed to repay advances in excess of earned commissions." Consequently, he was entitled to retain such advances when he ceased working for the company.

As the majority has observed, Connecticut law provides that "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used *interpreted in the light of the situation of the parties and the circumstances connected with the transaction.* . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Emphasis added; internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, supra, 269 Conn. 610.[2]

The majority appears to agree with these principles when it notes that, among those jurisdictions that have considered the question, the greater number have concluded that, "if no express or implied contract for repay-

[2] I agree with the majority that, because the defendants claim that the trial court incorrectly construed and applied Connecticut law, our review is plenary. See, e.g., *Kelly* v. *Stop & Shop, Inc.*, 281 Conn. 768, 776, 918 A.2d 249 (2007).

ment is established, the employee is not liable to the employer for repayment of advances that exceed earned commissions." (Emphasis added.) Part IV of the majority opinion, citing *Kennesaw Life & Accident Ins. Co. v. Hendricks*, 108 Ga. App. 148, 150, 132 S.E.2d 152 (1963) (employer may not recover advances that exceed commissions earned "in the absence of an express or implied agreement, or promise to repay any excess of advances" [internal quotation marks omitted]). The majority also recognizes that other jurisdictions have concluded that an employee may be liable for the repayment of advances "in the absence of an express written agreement where *other evidence* establishes the parties' understanding or implied agreement that the employee was obligated to repay the excess advances." (Emphasis added.) Footnote 10 of the majority opinion. The majority concludes, however, that the mere use of the word "advance" in the parties' employment agreement is insufficient to establish a repayment obligation. I disagree with the majority's reasoning and submit that the trial court was obligated to consider the language of the contract as a whole in light of the parties' negotiations, which indicated that Ravetto would not be allowed to retain advances against unearned commissions. See *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, supra, 269 Conn. 610–11.

The agreement specifically provided: "You may take a 'draw' on your sales commission of up to $2710 per pay period, up to a maximum advance of $65,000. This bonus plan . . . will remain in effect until sales force growth requires a reorganization. Changes to your compensation or the calculation thereof will be by mutual agreement." To ascertain the commonly approved usage of a term, we look to its definition in the dictionary. E.g., *Hummel* v. *Marten Transportation, Ltd.*, 282 Conn. 477, 498, 923 A.2d 657 (2007). According to Webster's Third New International Dictionary, the common

and ordinary meaning of the term "draw" is "to gain as a recompense or one's due . . . as for services," or "to pay out money held to the credit of the drawer . . . ." The ordinary meaning of the term "advance" is "to supply (as money or other value) beforehand in expectation of repayment or other future adjustment . . . ." Webster's Third New International Dictionary. These definitions indicate that when the term "advance" is used in a contract, it implies a future accounting to reconcile money paid in expectation of work to be performed with money owed if expectations are not fulfilled. That Ravetto might not earn the sales commissions necessary to justify the advances he drew was reflected in column four of the addendum to the employment agreement, captioned "[e]xcess of earnings," which provided examples of situations in which advances might exceed earned commissions and thus require repayment.

Furthermore, the language of the employment agreement was permissive in nature, specifically providing that "[y]ou may take a 'draw' on your sales commission," and placed a cap of $65,000 on advances that Ravetto could obtain during his initial eighteen months with the company. These provisions indicate that the advances were not regarded by the parties as guaranteed income. Indeed, common sense dictates that giving Ravetto the *option* of drawing advances against unearned commissions meant that they were not intended as guaranteed income and would require repayment should Ravetto fail to produce the necessary sales.

Correspondence during the negotiations confirmed that the parties did not view the advances as guaranteed income. Ravetto admitted that, because the company was "[a] startup effort to introduce a new technology to mature industrial markets" with no established "business flow," and because there might be substantial resistance to change among the targeted customers, his

ability to generate sales during his first two years with the company would be limited. In explaining to Triton his decision to decline its initial offer, he estimated that he would earn only $10,000 in sales commissions during his first year of employment and only $25,000 in commissions during his second year of employment because there would be "zero base business sales for Triton when the sales director walk[ed] in the door . . . ." Ressler generally agreed with Ravetto's assessment of the company and affirmed that "there is no way that we can guarantee the outcome. . . . I repeat, no guarantees." Although there may have been undocumented conversations between the parties and the executive recruiter on salary and commissions following this exchange, the only tangible result was Triton's offer to increase Ravetto's annual salary to $110,000 and to give him the option of taking regular advances on unearned commissions should he wish to do so. In addition, Ravetto indicated, by signing the personnel form, that any promises Triton might have made, other than those included in the written offer, would not be binding. The parties' negotiations thus suggest an understanding that any advances would be repaid or require other financial adjustments in Ravetto's compensation if they were to exceed commissions earned. Accordingly, the trial court should have considered this evidence in construing the terms "advance" and "draw."

The majority concludes that the trial court's determination that "Ravetto never agreed to repay advances in excess of earned commissions" suggests that the court considered the negotiations when rejecting Triton's claim. I disagree. The trial court's conclusion that Ravetto never agreed to repay the advances directly followed its observation that the agreement was silent on the issue of repayment. The majority's inference that the trial court considered evidence outside the four corners is, therefore, entirely unsupported.

Moreover, Triton's failure to seek an articulation from the trial court as to whether it considered such evidence is not fatal, as the majority insists. "[A]n articulation is appropriate [when] the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis [on] which the trial court rendered its decision, thereby sharpening the issues on appeal." (Internal quotation marks omitted.) *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 738, 937 A.2d 656 (2007). In the present case, the trial court did not fail to address the issue of whether the parties agreed that Ravetto would be required to repay excess advances. The court expressly found that "[t]he written employment agreement in this case is silent as to whether an employee is required to pay back excess advances. It does not contain any express language on reimbursement of unearned commissions." Accordingly, the factual and legal basis for the trial court's decision is clear. To the extent that the court's decision may be considered incomplete because it did not make findings concerning *all* of the evidence presented, "[i]t was the province of the court, as the finder of fact, to assess the evidence and to determine which factual grounds supported its decision." *State* v. *Bennett*, 101 Conn. App. 76, 82, 920 A.2d 312 (2007). These grounds were stated in its ruling. Consequently, there is no ambiguity in the trial court's decision, and Triton had no responsibility to seek an articulation in appealing from that court's judgment.

Additionally, I disagree with the majority's decision to promulgate a rule that, in the absence of an explicit provision in the employment agreement holding an employee personally liable for advances, an employer must show by the employee's conduct that he or she intended to be held personally liable for the repayment

of advances that exceeded earned commissions. In my view, such a rule is unnecessary because traditional contract principles require the employer to prove by a fair preponderance of the evidence that the parties contemplated repayment. See *Coelho* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 112, 544 A.2d 170 (1988) (party alleging implied agreement by words, action or conduct has burden to prove by fair preponderance of evidence that agreement existed). If the employer fails to satisfy its burden, the employee is not liable for the repayment, and an additional rule serves no purpose. Moreover, the rule that the majority adopts does not permit examination of other language in the employment agreement that, when read together with the provisions in question, may provide a more complete understanding of the parties' intent.

Finally, I do not agree with some of the theoretical justifications on which the majority relies in adopting such a rule. For example, a potential employer does not always possess superior bargaining power in an employment relationship. When Ravetto interviewed with Triton, he was employed by Nash and was earning annual compensation of approximately $170,000. Triton, on the other hand, was a start-up company with limited resources and repeatedly told Ravetto that it could not guarantee the company's future success. It is therefore clear that Ravetto, rather than Triton, had superior bargaining power in discussing the terms of his potential employment with the company.

With respect to the majority's theory that when an employee works for an employer on a commission basis, the employee and employer are engaged in a joint venture in which they share the risk, the majority fails to acknowledge that, in the present case, the analogy does not apply because Ravetto was not compensated solely on a commission basis; rather, he received a substantial salary of $110,000 before commissions.

Thus, even if Ravetto earned no commissions, it would be disingenuous to suggest that a salary of this magnitude placed Ravetto in the precarious position of assuming a major share of the risk associated with Triton's business.

For all of the foregoing reasons, I respectfully dissent in part.